Virginia PIKOP, Appellant,

v.

BURLINGTON NORTHERN
RAILROAD COMPANY,
Respondent,

Clarence Patterson, et al., Defendants.

and

Romesh GULATI, Respondent,

v.

BURLINGTON NORTHERN
RAILROAD COMPANY,
petitioner, Appellant.

Nos. C7–84–1333, C4–85–1431.

Supreme Court of Minnesota.

Aug. 1, 1986.

Rehearing Denied Aug. 29, 1986.

Michael P. McReynolds, Burlington Northern R. Co., St. Paul, for Burlington Northern R. Co., in No. C7–84–1333.

Robert Bennett, Daniel McInerny, Minneapolis, for Virginia Pikop.

Thomas P. Kane, Bethany K. Culp, St. Paul, for Burlington Northern R. Co., in No. C4–85–1431.

Michael Doshan, and Michael L. Weiner, Minneapolis, for Romesh Gulati.

SCOTT, Justice.

Virginia Pikop and Romesh Gulati are former employees of Burlington Northern Railroad Company (Burlington Northern), who individually filed suit against the railroad in state court, claiming intentional infliction of emotional distress. Burlington Northern contends that both suits are preempted by the Railway Labor Act (RLA), 45 U.S.C. §§ 151–63 (1982), and/or the Federal Employers' Liability Act (FELA), 45 U.S.C. §§ 51–60 (1982). We conclude that the two federal acts do not preempt state-court jurisdiction over a former railway employee's claim of intentional infliction of emotional distress where the

alleged distress results from a continual pattern of harassment on the part of the railroad-employer. We therefore remand the two cases for trial in the respective district courts.

*Pikop's claim.*

From September 24 to November 25, 1981, Virginia Pikop was employed by Burlington Northern as a seasonal section-crew worker. At various times during this period, her direct supervisor allegedly forced her into his vehicle and coerced her, through threats and promises relating to her employment, to perform sexual acts against her will. Despite her complaints to Burlington Northern officials, Pikop's supervisor allegedly continued to sexually assault her, a pattern that allegedly persisted even after she was no longer employed by the railroad.

During the two months in which she was employed at Burlington Northern, Pikop was allegedly subjected to continual harassment by co-employees, who repeatedly called her "pig," "bitch," and "cunt." Several employees allegedly assaulted Pikop during working hours.

As a section-crew worker, Pikop was employed in railroad yards, where she often had contact with employees of the railroad's pest control program. Pikop alleges that these employees constantly threatened her with rat carcasses, repeatedly forced her to watch them torture and mutilate rats and birds, and occasionally coerced her to participate in the mutilation and torture. She maintains that railroad supervisors allowed this conduct on the part of her co-employees to take place repeatedly.

After Pikop was furloughed from her seasonal position with Burlington Northern, she sought psychiatric counseling. She claims that as a result of the alleged harassment and outrageous conduct on the part of the railroad and its employees, she has suffered serious and permanent emotional injuries.

Pikop first brought suit against Burlington Northern and four individual employees in Hennepin County District Court on November 17, 1982, alleging, *inter alia,* the intentional infliction of emotional distress. In its answer, Burlington Northern argued that the exclusive remedy for Pikop's claims was the FELA. As a result, Pikop voluntarily dismissed, without prejudice, the complaint she filed in state court and brought suit against the railroad and the individual employees in federal district court on December 21, 1982. In addition to her FELA claim, Pikop sought to recover damages under state-law claims of assault, battery, false imprisonment, and intentional infliction of emotional distress.

In federal court, Burlington Northern moved for summary judgment. The court granted Burlington Northern's motion on Pikop's claim of intentional infliction of emotional distress, ruling that Pikop's exclusive remedy against the railroad was under the FELA and that the FELA did not recognize an independent cause of action for the intentional infliction of emotional distress.[1] The court allowed those claims that were actionable under the FELA to go to trial.

On March 18, 1985, Pikop brought suit against the railroad and three individual railway employees in Hennepin County District Court, alleging, *inter alia,* the intentional infliction of emotional distress.[2] Thereafter, Burlington Northern moved to have Pikop's claim against it dismissed. On July 11, 1985, the district court ordered entry of judgment in favor of the railroad, ruling that Pikop's claim was preempted by the FELA. Pikop appealed to the court of appeals. Burlington Northern petitioned this court for an accelerated review. We granted the petition on December 13, 1985, and now reverse the district court.

---

1. The federal court also ruled that it would not invoke pendent-party jurisdiction over Pikop's claims against the individual employees, claims that included assault, battery, false imprisonment, negligence, and intentional infliction of emotional distress.

2. Included in Pikop's complaint were the state-law claims over which the federal court refused to invoke pendent-party jurisdiction.

*Gulati's claim.*

In 1967, Romesh Gulati was hired as a Machinist Federal Inspector for Burlington Northern Railroad. In 1975, Gulati injured his hand during the course of his employment with the railroad. He brought suit on September 21, 1977, to recover damages under the FELA for lost wages and permanent disability of his hand. Burlington Northern settled Gulati's suit on March 10, 1980, agreeing to pay Gulati $47,250 and to allow Gulati to continue working as a machinist for the railroad company.

On July 31, 1980, Burlington Northern sent Gulati a notice that the company was investigating him for allegedly falsifying a time card. He was requested to appear at a hearing concerning this charge. Gulati maintained that he had pencilled on his card 6:30 p.m. as the time of his departure on July 28, 1980, and that a co-employee had erased this time and written, in its place, 11:00 p.m. Upon investigation, the railroad dropped the charge against Gulati. It did not, however, further investigate the matter, nor did it bring charges against the co-employee accused of forging Gulati's card.

On August 4, 1980, Burlington Northern sent another notice to Gulati, alleging that he had been involved in an altercation during working hours. He was once again requested to appear at an investigatory hearing. Gulati stated that without provocation a co-employee had sprayed him with a water hose and that he had immediately reported the actions of the co-employee to a supervisor. Burlington Northern dropped the rule-violation charge against Gulati. It did not, however, pursue any disciplinary action against the co-employee whom Gulati had named as the one who sprayed him with water.

During the summer of 1980, an employee of Burlington Northern witnessed two railway employees ransacking Gulati's personal locker. At the time Gulati's locker was allegedly being searched, Gulati was allegedly being detained by a railroad supervisor. The witness noted that the searching of lockers was not a common practice of railroad officials.

Gulati maintains that from March to September, 1980, he was continually subjected to racial slurs from employees of Burlington Northern. Such comments included: "Come over here, Indian," "That stinking Arab," "Where's your camel parked?" and "Does your camel have one hump or two?" One employee stated that he had heard Burlington Northern officials say, "We will get that S.O.B." (referring to Gulati) and, "Have you had any luck getting that S.O.B. 'cause I know you are trying?"

On September 5, 1980, Burlington Northern notified Gulati that the company was investigating him for allegedly leaving work one day without proper authorization. Gulati was requested to appear at an investigatory hearing. After the hearing, the railroad discharged Gulati for the unexcused absence. Gulati appealed this decision to the National Railroad Adjustment Board, Public Law Board No. 3008, which voted 2–1 to uphold his permanent discharge from employment.

Six months after his discharge from Burlington Northern, on March 30, 1981, Gulati suffered a heart attack at the age of 40. After his discharge he also began consulting a psychiatrist.

Gulati filed suit against Burlington Northern in Hennepin County District Court on April 12, 1982. He alleged that Burlington Northern breached the 1980 settlement of his FELA claim; that the company wrongfully discharged him; and that it inflicted emotional distress on him through a pattern of harassment and surveillance. Burlington Northern petitioned to have Gulati's claims removed to federal district court under 28 U.S.C. § 1441 (1982), a petition that was denied by the federal court on September 10, 1982.[3] Thereafter,

---

**3.** The court recognized that federal removal jurisdiction is derivative, in that only claims that are properly brought in state courts can be removed to federal courts. The court noted that

Burlington Northern contended the state court did not have jurisdiction over Gulati's claims. If that were the case, the court stated, a federal court would have no removal jurisdiction. On

Burlington Northern moved for summary judgment in state court. The district court granted the railroad's motion on two of Gulati's claims, concluding that Gulati's wrongful-discharge and breach-of-contract claims were preempted by the Railway Labor Act. The court, however, denied the railroad's motion to dismiss the claim of intentional infliction of emotional distress on similar preemption grounds. Burlington Northern then petitioned the court to certify the preemption question to the Minnesota Court of Appeals under Rule 103.-03(h) of the Minnesota Rules of Civil Appellate Procedure. The court granted the motion and certified the following question, as important and doubtful, to the appeals court: "Does the Railway Labor Act and/or the Federal Employer's Liability Act preempt state court jurisdiction over plaintiff's claim of intentional infliction of emotional distress?"

The court of appeals answered the certified questions in the negative, stating that the Federal Employers' Liability Act does not preempt state-court jurisdiction over a claim of intentional infliction of emotional distress and that, although the Railway Labor Act does preempt a claim of intentional infliction of emotional distress where the distress results from a discharge by a railroad, it does not preempt such a claim where the emotional distress results from a pattern of employer harassment. *Gulati v. Burlington Northern Railroad Co.*, 364 N.W.2d 446 (Minn.Ct.App.1985). We granted Burlington Northern's petition for further review on May 24, 1985, and now answer the certified questions in the negative.

### The Preemption Doctrine

The preemption doctrine seeks to accommodate the interest of uniform, national regulation on the one hand, and the preservation of federalism on the other. Thus, the fact that Congress has entered a field of regulation does not necessarily preclude all state action in the area. As the United States Supreme Court recently noted: "Preemption of state law by federal statute or regulation is not favored 'in the absence of pervasive reasons—either that the nature of the regulated subject matter permits no other conclusion, or that the Congress has unmistakably so ordained.' " *Chicago & North Western Transportation Co. v. Kalo Brick & Tile Co.*, 450 U.S. 311, 317, 101 S.Ct. 1124, 1130, 67 L.Ed.2d 258 (1981) (quoting *Florida Lime & Avocado Growers, Inc. v. Paul*, 373 U.S. 132, 142–43, 83 S.Ct. 1210, 1217, 10 L.Ed.2d 248 (1963)). *See also, Wardair Canada, Inc. v. Florida Department of Revenue,* —— U.S. ——, ——, 106 S.Ct. 2369, 2370, 91 L.Ed.2d 1 (1986) ("state law is not preempted whenever there is any federal regulation of an activity or industry or area of law"). One authoritative text states:

Federal law is generally interstitial in its nature. It rarely occupies a legal field completely, totally excluding all participation by the legal systems of the states. This was plainly true in the beginning when the federal legislative product (including the Constitution) was extremely small. It is significantly true today, despite the volume of Congressional enactments, and even within areas where Congress has been very active. Federal legislation, on the whole, has been conceived and drafted on an *ad hoc* basis to accomplish limited objectives. It builds upon legal relationships established by the states, altering or supplanting them only so far as necessary for the special purpose. Congress acts, in short, against the background of the total *corpus juris* of the states in much the way that a state legislature acts against the background of the common law, assumed to govern unless changed by legislation.

P. Bator, D. Shapiro, P. Mishkin & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System, 470–71 (2d ed. 1973). *See Richards v. United States*, 369 U.S. 1, 7, 82 S.Ct. 585, 589, 7 L.Ed.2d

---

the other hand, the court stated, if Gulati were correct in contending that his claims were independent state actions, no federal question would exist on which federal jurisdiction could rest. The removal petition was therefore denied.

492 (1962); *Burks v. Lasker*, 441 U.S. 471, 478, 99 S.Ct. 1831, 1837, 60 L.Ed.2d 404 (1979).

■ Against this theoretical backdrop, the United States Supreme Court has recognized three distinct kinds of cases in which the doctrine applies to preempt state law. The first arises when Congress explicitly states that the federal scheme preempts any state action in the field. *See Jones v. Rath Packing Co.*, 430 U.S. 519, 525, 97 S.Ct. 1305, 1309, 51 L.Ed.2d 604 (1977). This instance, however, is rare, for Congress seldom expressly precludes all state law in a given regulatory field. The second case, in which Congress implicitly preempts state law, is somewhat more common. In such a case, preemption is inferred from either the extent of the federal involvement or the scope of the federal interest. *See Fidelity Federal Savings & Loan Association v. De la Cuesta*, 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982); *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947). Even where Congress has not, either explicitly or implicitly, displaced all state action in a specified field, the preemption doctrine will invalidate any state law that, in fact, conflicts with the federal law. This third case arises when compliance with both the federal and state law is a physical impossibility or when the state law is an obstacle to the accomplishment of the purposes of the federal scheme. *See Florida Lime & Avocado Growers*, 373 U.S. at 142–43, 83 S.Ct. at 1217; *Hines v. Davidowitz*, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941).

■ As is evident from the case law, the question of preemption is primarily one of statutory construction. If no express preemptive language is evident in the federal statute or regulation, factors in the federal law that indicate an implicit preemption must be considered. If neither an express nor an implied preemptive effect is present, the nature of the state law or action must be examined to determine whether it conflicts with the federal scheme. Therefore, we must consider the two federal acts that Burlington Northern contends preempt Pikop's and Gulati's state-law claims.

*The Railway Labor Act*

In order to avoid interruptions of interstate commerce, Congress first enacted the Railway Labor Act in 1913. RLA, Pub.L. No. 63–6, 38 Stat. 103 (1913) (codified as amended at 45 U.S.C. §§ 151–63 (1982)). The Act seeks to avoid disruptions in railway transportation by providing a process for the resolution of labor disputes. *See Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. 711, 722–23, 65 S.Ct. 1282, 1289, 89 L.Ed. 1886 (1945). As amended, the RLA recognizes the right of railway employees to join a labor organization that can act as the employees' representative in the formation of a collective-bargaining agreement. The law also provides a procedure to settle grievances that arise under an existing collective-bargaining agreement.

Congress did not *expressly* preempt the railway labor field in enacting the Railway Labor Act. Thus, the question with which we are confronted is whether Congress *implicitly* preempted all state action in the area.

The RLA is, no doubt, comprehensive in its regulation of the process leading up to the formation of a collective-bargaining agreement between a railroad and its employees. The designation of a labor organization to represent railway employees is detailed. 45 U.S.C. § 152 (1982). A mediation board to settle disputes concerning the process for a new collective-bargaining agreement is established. 45 U.S.C. §§ 154–56 (1982). A board of arbitration is also formed to settle collective-bargaining disputes not resolved by the mediation board. 45 U.S.C. §§ 157–59 (1982). Thus, the resolution of such "major disputes" appears to be an exclusive federal concern.[4]

---

**4.** A major dispute under the RLA concerns the process involved in reaching a new collective-bargaining agreement. 45 U.S.C. § 152 (1982). *See Brotherhood of Railroad Trainmen v. Chica-*

Congress could not have intended that the states supplement this area by promulgating additional procedures pertaining to the formation of a new collective-bargaining agreement. *See Slocum v. Delaware, Lackawanna & Western Railroad Co.*, 339 U.S. 239, 70 S.Ct. 577, 94 L.Ed. 795 (1950).

■ In addition to providing a procedure whereby disputes concerning the process for a new collective-bargaining agreement are resolved, Congress included in the RLA a method of resolving so-called "minor disputes"—disagreements over the interpretation or application of existing collective-bargaining agreements.[5] The Act establishes an adjustment board to resolve such disputes and allows the railroad and its employees to form their own dispute-resolution process. 45 U.S.C. § 153 (1982).

In *Andrews v. Louisville & Nashville Railroad Co.*, 406 U.S. 320, 92 S.Ct. 1562, 32 L.Ed.2d 95 (1972), the United States Supreme Court held that the procedures for the resolution of minor disputes are mandatory and a railway employee cannot ignore the remedies of the Act by commencing an action in state court to resolve

such disputes. The Court overruled its decision in *Moore v. Illinois Central Railroad Co.*, 312 U.S. 630, 61 S.Ct. 754, 85 L.Ed. 1089 (1941), in which it was held that the right of a railway employee to sue the railroad for wrongful discharge was not dependent on an exhaustion of the RLA's administrative remedies. The *Andrews* Court fell short of holding that the RLA preempts all state remedies for a minor dispute. It noted, however:

The term "exhaustion of administrative remedies" in its broader sense may be an entirely appropriate description of the obligation of both the employee and carrier under the Railway Labor Act to resort to dispute settlement procedures provided by that Act. It is clear, however, that in at least some situations the Act makes the federal administrative remedy exclusive, rather than merely requiring exhaustion of remedies in one forum before resorting to another. A party who has litigated an issue before the Adjustment Board on the merits may not relitigate that issue in an independent judicial proceeding. He is limited to the judicial review of the Board's pro-

---

go *River & Indiana Railroad Co.*, 353 U.S. 30, 33, 77 S.Ct. 635, 636, 1 L.Ed.2d 622 (1957); *Brotherhood of Railway & Steamship Clerks, Freight Handlers, Express and Station Employees v. Florida East Coast Railway Co.*, 384 U.S. 238, 86 S.Ct. 1420, 16 L.Ed.2d 501 (1966). In *Elgin, Joliet & Eastern Railway Co. v. Burley*, 325 U.S. at 723, 65 S.Ct. at 1289, the United States Supreme Court discussed what constitutes a major dispute:

The first [referring to major disputes] relates to disputes over the formation of collective agreements or efforts to secure them. They arise where there is no such agreement or where it is sought to change the terms of one, and therefore the issue is not whether an existing agreement controls the controversy. They look to the acquisition of rights for the future, not to assertion of rights claimed to have vested in the past.

**5.** The United States Supreme Court has defined minor disputes under the RLA as "controversies over the meaning of an existing collective bargaining agreement in a particular fact situation, generally involving only one employee." *Brotherhood of Railroad Trainmen v. Chicago River & Indiana Railroad Co.*, 353 U.S. at 33, 77 S.Ct. at 636. In *Elgin, Joliet & Eastern Railway Co v.*

*Burley*, 325 U.S. at 723–24, 65 S.Ct. at 1289–90, the Court stated:

In general the difference is between what are regarded traditionally as the major and minor disputes of the railway labor world. The former present the large issues about which strikes ordinarily arise with the consequent interruptions of traffic the Act sought to avoid. Because they more often involve those consequences and because they seek to create rather than to enforce contractual rights, they have been left for settlement entirely to the processes of noncompulsory adjustment.

The so-called minor disputes, on the other hand, involving grievances, affect the smaller differences which inevitably appear in the carrying out of major agreements and policies or arise incidentally in the course of an employment. They represent specific maladjustments of a detailed or individual quality. They seldom produce strikes, though in exaggerated instances they may do so. Because of their comparatively minor character and the general improbability of their causing interruption of peaceful relations and of traffic, the 1934 Act sets them apart from the major disputes and provides for very different treatment.

(Footnotes omitted.)

ceedings that the Act itself provides. In such a case the proceedings afforded by 45 U.S.C. § 153 First (i), will be the only remedy available to the aggrieved party. 406 U.S. at 325, 92 S.Ct. at 1565 (citations omitted).

*Andrews* would preclude a state-law claim that is, in essence, a minor dispute under the RLA. Thus, if Pikop and Gulati were suing Burlington Northern for wrongful discharge, their claims would be preempted by the exclusive procedure of the Act because a discharge from employment is a matter within the parameters of a collective-bargaining agreement and therefore a minor dispute under the RLA. *See Andrews*, 406 U.S. at 324, 92 S.Ct. at 1565; *Union Pacific Railroad Co. v. Price*, 360 U.S. 601, 617, 79 S.Ct. 1351, 1359, 3 L.Ed.2d 1460 (1959). *See also, Jackson v. Consolidated Rail Corp.*, 717 F.2d 1045 (7th Cir.1983), *cert. denied*, 465 U.S. 1007, 104 S.Ct. 1000, 79 L.Ed.2d 233 (1984) (railway employee's claim of retaliatory discharge preempted by RLA); *Choate v. Louisville & Nashville Railroad Co.*, 715 F.2d 369 (7th Cir.1983) (railway employee's claim that railroad wrongfully discharged him and failed to reinstate him is a minor dispute under the RLA); *Magnuson v. Burlington Northern, Inc.*, 576 F.2d 1367 (9th Cir.1978), *cert. denied*, 439 U.S. 930, 99 S.Ct. 318, 58 L.Ed.2d 323 (1978) (wrongful discharge claim of railway employee preempted).

■ Unlike a claim of wrongful discharge, a claim of intentional infliction of emotional distress where the distress results from a continual pattern of harassment is not a minor dispute under the RLA. Such a claim does not "stem from differing interpretations of the collective-bargaining agreement," *Andrews*, 406 U.S. at 324, 92 S.Ct. at 1565, but rather is premised on the tort-law principle that citizens of our state must be protected from conduct "so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community." *Haagenson v. National Farmers Union Property and Casualty Co.*, 277 N.W.2d 648, 652 n. 3 (Minn.

1979) (citing the Restatement (Second) of Torts § 46, Comment d (1965)). The conduct that Pikop and Gulati allege transcends the four corners of the collective-bargaining agreement Burlington Northern entered into with its employees. The alleged behavior, if proven, will constitute a continual pattern of harassment on the part of Burlington Northern, conduct that is not merely a wrongful discharge claim or other grievance premised on a collective-bargaining agreement.

Burlington Northern contends that a claim of intentional infliction of emotional distress relates to a working condition and thus must be resolved by the administrative procedures of the Act. We disagree. In *Terminal Railroad Association of St. Louis v. Brotherhood of Railroad Trainmen*, 318 U.S. 1, 63 S.Ct. 420, 87 L.Ed. 571 (1943), the United States Supreme Court upheld a state safety requirement that cabooses be attached to all trains operating within the state. The railroad had argued that the RLA precluded the state from regulating such working conditions. The Court disagreed, stating:

> The Railway Labor Act, like the National Labor Relations Act, does not undertake governmental regulation of wages, hours, or working conditions. Instead it seeks to provide a means by which agreement may be reached with respect to them. The national interest expressed by those Acts is not primarily in the working conditions as such. So far as the Act itself is concerned these conditions may be as bad as the employees will tolerate or be made as good as they can bargain for. The Act does not fix and does not authorize anyone to fix generally applicable standards for working conditions. The federal interest that is fostered is to see that disagreement about conditions does not reach the point of interfering with interstate commerce. The Mediation Board and Adjustment Board act to compose differences that threaten continuity of work, not to remove conditions that threaten the health or safety of workers.

State laws have long regulated a great variety of conditions in transportation and industry, such as sanitary facilities and conditions, safety devices and protections, purity of water supply, fire protection, and innumerable others. Any of these matters might, we suppose, be the subject of a demand by workmen for better protection and upon refusal might be the subject of a labor dispute which would have such effect on interstate commerce that federal agencies might be invoked to deal with some phase of it. But we would hardly be expected to hold that the price of the federal effort to protect the peace and continuity of commerce has been to strike down state sanitary codes, health regulations, factory inspections, and safety provisions for industry and transportation. We suppose employees might consider that state or municipal requirements of fire escapes, fire doors, and fire protection were inadequate and make them the subject of a dispute, at least some phases of which would be of federal concern. But it cannot be that the minimum requirements laid down by state authority are all set aside. *We hold that the enactment by Congress of the Railway Labor Act was not a preemption of the field of regulating working conditions themselves and did not preclude the State of Illinois from making the order in question.*

*Id.* at 6–7, 63 S.Ct. at 423 (footnote and citation omitted; emphasis added). *See also Brotherhood of Locomotive Engineers v. Baltimore & Ohio Railroad Co.*, 372 U.S. 284, 289–90, 83 S.Ct. 691, 694, 9 L.Ed.2d 759 (1963) (reiterating that the RLA does not regulate "wages, hours, or working conditions").

Although Pikop's and Gulati's claims do not constitute either a major dispute or a minor dispute under the Act, their claims would, nevertheless, be preempted if Congress intended to preclude any claims against the railroad other than those that are, in essence, major or minor disputes under the RLA. In determining such congressional intent, we must examine the potential for interference with the federal scheme that such a claim presents. *See Fidelity Federal Savings*, 458 U.S. at 153, 102 S.Ct. at 3022; *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152; *Hines*, 312 U.S. at 67, 61 S.Ct. at 404. This potential for interference is then weighed against the nature of the state interest in regulating the conduct in question. Thus, when the potential for interference is nil and the state interest involved is substantial, we can infer that Congress did not intend to preempt the state-law claim. This balancing approach is derived from *Farmer v. United Brotherhood of Carpenters & Joiners of America, Local 25*, 430 U.S. 290, 97 S.Ct. 1056, 51 L.Ed.2d 338 (1977).

■ In *Farmer*, the United States Supreme Court held that the National Labor Relations Act (NLRA) did not preempt a union member's state-law claim of intentional infliction of emotional distress.[6] The Court in *Farmer* noted that no provision of the NLRA protected the union member from the outrageous conduct alleged in the complaint. Such is the case here. The RLA affords Pikop and Gulati no remedy for conduct that constitutes the intentional infliction of emotional distress. An adjustment board could not award money damages as compensation for the injuries alleged in either Pikop's or Gulati's complaint. The RLA relates only to the collective-bargaining process in the railway industry and seeks only to resolve major and

---

6. Burlington Northern contends that the preemption analysis of *Farmer* is inapplicable to this case because the National Labor Relations Act is not as comprehensive as the Railway Labor Act. We concur, however, in Judge Posner's analysis of the issue in *Jackson v. Consolidated Rail Corp.*, 717 F.2d at 1060 (J. Posner, concurring in part and dissenting in part). "It might be different," Judge Posner noted, "if

Congress had established an administrative agency to police tort or tort-like conduct in railroad employment, but it has not; it has contented itself with requiring arbitration of contract disputes." Requiring arbitration of railway contract disputes is not unlike the limited scope of the NLRA's dispute-resolution process.

minor disputes that arise in that process. No such dispute is claimed here. Therefore, "permitting the exercise of state jurisdiction over such complaints does not result in state regulation of federally protected conduct." *Farmer,* 430 U.S. at 302, 97 S.Ct. at 1064. *See also Brotherhood of Railroad Trainmen v. Howard,* 343 U.S. 768, 72 S.Ct. 1022, 96 L.Ed. 1283 (1952) (Black railway employees have a judicial remedy to prevent discrimination because no adequate administrative remedy exists under the RLA).

Moreover, a state trial court considering such a state-law claim by a former railway employee would not be interpreting the railroad's collective-bargaining agreement with its employees, an inquiry that is reserved exclusively to the federal boards established in the RLA. The focus of the state court's investigation would be on whether the elements of the tort alleged have been proven. Such a determination would be made "without resolution of the 'merits' of the underlying labor dispute," if any. *Farmer,* 430 U.S. at 304, 97 S.Ct. at 1065.

■ In Minnesota, recovery for the intentional infliction of emotional distress is limited to those cases in which an aggrieved party can establish conduct that was "extreme and outrageous" and "intentional or reckless." The conduct must also have caused emotional distress that is "severe." *Hubbard v. United Press International, Inc.,* 330 N.W.2d 428, 438–39 (Minn.1983). As we noted in *Hubbard:*

> In explaining both the extreme nature of the conduct necessary to invoke this tort, and the necessary degree of severity of the consequent mental distress, the Restatement's commentary emphasizes the limited scope of this cause of action, and clearly reflects a strong policy to prevent fictitious and speculative claims. Because this policy has long been a central feature of Minnesota law on the availability of damages for mental distress, our adoption of the Restatement formulation as the standard for the independent tort of intentional infliction of emo-

tional distress does not signal an appreciable expansion in the scope of conduct actionable under this theory of recovery. The operation of this tort is sharply limited to cases involving particularly egregious facts.

*Id.* at 439 (footnote omitted). The fact that the tort is limited to such cases decreases the potential for undue interference with the RLA. *See Farmer,* 430 U.S. at 305, 97 S.Ct. at 1066.

It is apparent that our recognition of a state remedy for the intentional infliction of emotional distress in this case would not frustrate the collective-bargaining process of the RLA. In *Brotherhood of Railroad Trainmen v. Jacksonville Terminal Co.,* 394 U.S. 369, 89 S.Ct. 1109, 22 L.Ed.2d 344 (1969), the Court held that the RLA does not allow a state to preclude all self-help remedies to a railway carrier or union after the parties have exhausted the administrative procedures of the Act. Such a preclusion, the Court said, would make the Act's entire scheme for the resolution of major disputes meaningless. Here, such is not the case. Unlike the state action in *Jacksonville,* a state remedy for the intentional infliction of emotional distress does not relate to the collective-bargaining process itself. The Act only serves to regulate such a process and thus Burlington Northern's argument that the potential for interference with the RLA scheme is such that preemption is mandated carries no weight.

Balanced against any interference with the federal scheme that such a tort claim may produce is the nature of the state's interest in protecting its citizens from the kind of conduct the tort action seeks to redress. *Farmer,* 430 U.S. at 302, 97 S.Ct. at 1064. The state interest in this case is substantial. In *Farmer,* the Court discussed the interest a state has in affording its citizens a remedy for the intentional infliction of emotional distress:

> The State, on the other hand, has a substantial interest in protecting its citizens from the kind of abuse of which Hill complained. That interest is no less worthy of recognition because it concerns

protection from emotional distress caused by outrageous conduct, rather than protection from physical injury, as in *Russell,* or damage to reputation, as in *Linn.* Although recognition of the tort of intentional infliction of emotional distress is a comparatively recent development in state law, see W. Prosser, Law of Torts, § 12, pp. 49–50, 56 (4th ed. 1971), our decisions permitting the exercise of state jurisdiction in tort actions based on violence or defamation have not rested on the history of the tort at issue, but rather on the nature of the State's interest in protecting the health and well-being of its citizens.

*Id.* at 302–03, 97 S.Ct. at 1064–65. Minnesota has a strong interest in protecting its citizens from outrageous emotional abuse because the emotional health and well-being of its citizens is vital, not only to a stable economy, but to a civilized culture. The conduct Pikop and Gulati complain of touches interests "deeply rooted in local feeling and responsibility." *San Diego Building Trades Council v. Garmon,* 359 U.S. 236, 244, 79 S.Ct. 773, 779, 3 L.Ed.2d 775 (1959).

In light of the substantial interest the state has in such tort actions and the lack of interference such an action places on the federal railway labor process, we hold that the RLA does not preempt a state-law claim of intentional infliction of emotional distress where the alleged distress results, not from a wrongful discharge, but from a continual pattern of harassment on the part of the railroad-employer.

*The Federal Employer's Liability Act*

Congress enacted the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60, to allow interstate railway employees and their dependent families to recover damages for injuries and death caused by the negligence of the railroad. Section 51 of the Act expressly limits liability to injuries or death "resulting in whole or in part from the *negligence* of any of the officers, agents, or employees of such carrier * *." 45 U.S.C. § 51 (1982) (emphasis added). Here, Pikop and Gulati are alleging that Burlington Northern intentionally inflicted emotional distress, a tort not premised, of course, on principles of negligence. In determining whether such a claim is preempted by the FELA, we must first consider whether a claim of intentional infliction of emotional distress constitutes a claim under the Act or whether it is separate and independent from the federal statute.

Although the FELA is couched in terms of negligence, the United States Supreme Court, using two distinct theories, has allowed FELA plaintiffs to recover for intentional assaults committed by co-employees. In *Jamison v. Encarnacion,* 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082 (1930), the Court applied the doctrine of respondeat superior and held that the term "negligence" in the Act was broad enough to include an assault committed by a railway employee in the course of discharging his or her duties and in furtherance of the railroad's business. In *Harrison v. Missouri Pacific Railroad Co.,* 372 U.S. 248, 83 S.Ct. 690, 9 L.Ed.2d 711 (1963) (per curiam), the Court, recognizing a direct-negligence theory of liability under the Act, held that a railroad can be liable if it hires and retains an employee disposed toward violence and that employee intentionally assaults a co-employee. Although the two theories on which the Court premised liability in these two cases are broad enough to encompass some other intentional acts in the railway context, the Court has not extended the FELA to cover intentional torts other than assault.

Using the respondeat superior and direct-negligence theories, lower federal courts have found liability under the Act for not only assault, but also battery and false arrest. *See, e.g., Slaughter v. Atlantic Coast Line Railroad Co.,* 302 F.2d 912 (D.C.Cir.1962), *cert. denied,* 371 U.S. 827, 83 S.Ct. 48, 9 L.Ed.2d 65 (1962); *Besta v. Consolidated Rail Corp.,* 580 F.Supp. 869 (S.D.N.Y.1984). An examination of federal case law, however, reveals that recovery for intentional acts under the FELA is limited to intentional torts that cause *physical* injury. As the United States Court of Ap-

peals for the Seventh Circuit recently noted: "[T]he FELA does not reach torts which work their harm through nonphysical means * * *." *Lancaster v. Norfolk & Western Railway Co.*, 773 F.2d 807, 815 (7th Cir.1985). This appears to be a well-established limitation of the FELA. *See, e.g., Bullard v. Central Vermont Railway, Inc.*, 565 F.2d 193 (1st Cir.1977) (the Act allows recovery for emotional distress that accompanies physical injuries); *McSorley v. Consolidated Rail Corp.*, 581 F.Supp. 642 (S.D.N.Y.1984) (the Act may cover intentional conduct that causes physical injury); *Cales v. Chesapeake & Ohio Railway Co.*, 300 F.Supp. 155 (W.D.Va. 1969) (an intentional tort that inflicts bodily injury may constitute negligence under the Act); Annot., 8 A.L.R.3d 442 (1966 & Supp. 1985).[7]

■ In order to recover for the intentional infliction of emotional distress, a plaintiff need not establish any physical injury, for the action seeks to compensate purely emotional injuries resulting from intentional acts. Neither the express language of the FELA nor its interpretation by federal courts covers such a claim. Indeed, at least two federal courts of appeals have considered the action to be independent of any claim arising under the Act. In *Lewis v. Louisville & Nashville Railroad Co.*, 758 F.2d 219, 221–22 (7th Cir.1985), the court stated:

The Railroad also argues that the intimidation count is not "separate and independent" because it involves "substantially the same facts and transactions" as the three FELA claims filed in state court. We disagree. The plaintiff premised his FELA counts on his injuries of April 19, 1977 and September 6, 1979. The wrong that he alleged was the negligence of the railroad up to the date of his second injury. The intimidation count,

by contrast, concerns an alleged intentional tort committed by the Railroad after he filed the first FELA claim. Since the intimidation claim alleged a different wrong and involved a different set of facts than the FELA claims, the intimidation claim was a "separate and independent" claim for purposes of section 1441(c) [removal jurisdiction].

(Citation omitted.) In *Tello v. Soo Line Railroad Co.*, 772 F.2d 458 (8th Cir.1985), the court noted that a railway employee's claim of intentional infliction of emotional distress is a "state law claim." *Id.* at 461.

Even though Pikop's and Gulati's claims of intentional infliction of emotional distress appear to fall outside the scope of the FELA, their claims may, nevertheless, be preempted if Congress intended to preclude all state action in the area. In enacting the FELA, Congress did not *explicitly* preempt the field. Thus, the question becomes whether it *implicitly* did so.

Congress' first attempt to enact compensatory relief for railway employees who were victims of railroad negligence came in 1906. The 1906 Act enacted a compensatory scheme that was premised on common-law notions of fault. Congress, however, modified the common law in two specific areas: it abolished the fellow-servant rule (which had acted to bar employees' recovery against their employer for injuries resulting from the negligence of co-employees) and relaxed the common law contributory negligence bar (Congress allowed recovery in cases in which the negligence of the employee was slight compared to the gross negligence of the railroad or co-employee). FELA, Pub.L. No. 59–219, 34 Stat. 232 (1906). The 1906 Act, however, had a short life. In 1908, the Supreme Court, in *Howard v. Illinois Central Railroad Co.*, 207 U.S. 463, 28 S.Ct. 141, 52 L.Ed. 297 (1908), struck down the statute,

**7.** The Ninth Circuit Court of Appeals, however, has held that where an employee has suffered an injury "attributable to employer negligence," the injury, whether characterized as mental or physical, is compensable under the FELA. *Buell v. Atchison, Topeka & Santa Fe Railway Co.*, 771 F.2d 1320 (9th Cir.1985), *cert. granted*

— U.S. ——, 106 S.Ct. 1946, 90 L.Ed.2d 356 (1986). Such a holding is very much in the minority. Moreover, the decision appears not to cover allegations of *intentional* infliction of emotional distress, but rather *negligent* acts on the part of co-employees, which inflict emotional injuries. *See, id.* at 1324.

holding that Congress could impose liability only in those cases in which a railway employee was killed or injured *while the railroad was engaged in interstate commerce.* Congress enacted another version of the FELA in late 1908. The 1908 Act established a fault-based scheme for compensation. Congress, however, rejected the 1906 Act's modified contributory negligence bar and adopted in its place a comparative negligence scheme. It also changed the common law in other specific areas, abolishing the assumption-of-risk defense and the fellow-servant rule. FELA, Pub.L. No. 60-100, 35 Stat. 65 (1908).[8]

Although the FELA did not establish a strict liability workers' compensation scheme, the United States Supreme Court in *New York Central Railroad Co. v. Winfield*, 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045 (1917), held that a railway employee cannot ignore the Act and instead rely on a state workers' compensation statute for a remedy against the railroad. A railway employee's reliance on a state strict liability compensatory scheme, the Court reasoned, would frustrate Congress' intent to enact a compensatory scheme that was premised on notions of fault. Therefore, the state workers' compensation statute as applied to railway employees was preempted by the FELA.

■ We believe that affording the railway employees in this case the state-tort remedy of intentional infliction of emotional distress will not similarly frustrate the fault-based scheme of the FELA. The state tort action would not impose strict liability on the railroad, but instead would apply common law principles of fault. As Justice Goldberg noted in *Gillespie v. United States Steel Corp.*, 379 U.S. 148, 164 n. 3, 85 S.Ct. 308, 317 n. 3, 13 L.Ed.2d 199 (1964) (J. Goldberg, dissenting in part): "*New York Central R. Co. v. Winfield, supra,* could require no more than pre-emp-

tion of *purely* state strict liability remedies." (Emphasis in original.)

■ We recognize, however, that some potential for interference may be present when a railway employee sues in state court for the intentional infliction of emotional distress. The enactment of a federal compensatory scheme implies that Congress did not intend for interstate commerce to be hampered by different state systems of compensation. This is certainly true in the context of physical injuries and death resulting from railroad negligence. Such interference, however, is minimized where emotional harm is alleged to have resulted from a continual pattern of intentional acts. The claim of intentional infliction of emotional distress lies outside the scope of this federal statute, which was enacted to compensate only physical injuries resulting from negligence. The fact that the state-law tort is sharply limited to cases involving particularly egregious facts further reduces any potential for interference with the federal scheme.

Balanced against the potential for interference with the federal scheme is the nature of the state interest involved. As we have already noted, Minnesota has a substantial interest in protecting its citizens from the type of harm that constitutes the intentional infliction of emotional distress. *See Farmer*, 430 U.S. at 302, 97 S.Ct. at 1064. To deny Pikop and Gulati the protection from this kind of conduct the state provides to each of its other citizens is to diminish the very importance of the state interest involved. Because the state interest is substantial and the potential for interference is minimal, we hold that the FELA does not preempt a railway employee's state-law claim of intentional infliction of emotional distress.

The judgment of the district court in Case No. C4-85-1431, *Pikop v. Burlington Northern Railroad Co.*, is reversed.

---

8. The 1908 Act was amended in 1910 to provide for concurrent jurisdiction of FELA claims and to preclude railroads from removing FELA actions filed in state courts. FELA, Pub.L. No. 61-117, 36 Stat. 291 (1910). In 1939, Congress amended the Act to extend the statute of limitations from two to three years and to expand the definition of interstate commerce in light of more recent Supreme Court rulings. FELA, Pub.L. No. 76-382, 53 Stat. 1404 (1939).

The certified questions are answered in the negative in Case No. C7–84–1333, *Gulati v. Burlington Northern Railroad Co.*

KELLEY, J., dissents.

KELLEY, Justice (dissenting):

Because I conclude the claims of Pikop and Gulati for intentional infliction of emotional distress solely arose out of their employment with the Burlington Northern and that the Federal Employers' Liability Act provides those employees with their exclusive remedy, I respectfully dissent.

The Federal Employers' Liability Act governs the recovery of damages for injuries or death by employees, or their dependent families, from employer carriers. Although the literal wording of the statute limits the carrier's liability to compensation for injuries or death caused by "negligence" of employees, 45 U.S.C. § 51 (1982), the act is demonstrative of the underlying supposition that safety of the physical and mental health of railroad employees is encouraged by the economic incentive of placing liability upon the employer. Thus, notwithstanding the statutory language speaks in terms of "negligence," the United States Supreme Court has permitted injured employees to recover from employers even though the act or acts giving rise to the injury were "intentional." *See, e.g., Jamison v. Encarnacion*, 281 U.S. 635, 50 S.Ct. 440, 74 L.Ed. 1082 (1930) where the court held that assaults committed by railroad employees against fellow employees in the course of the railroad employment were compensable in suits against the carrier. *See generally,* Note, *Respondent Superior and the Intentional Tort: A Short Discourse on How to Make Assault and Battery A Part of the Job*, 45 U.Cin.L. Rev. 235 (1976). *See also*, Annot., 8 A.L. R.3d 442 (1966).

The Court of Appeals for the Ninth Circuit in *Buell v. Atchison, Topeka & Santa Fe Railway Co.*, 771 F.2d 1320 (9th Cir. 1985), held that an employee's allegation that he had sustained emotional injury caused by intentional acts of railroad employees stated a claim under the FELA. In *Lancaster v. Norfolk & Western Railway Co.*, 773 F.2d 807, 818 (7th Cir.1985), the court recognized employee recovery under the FELA for intentional tort if the evidence established either that the intentional act (or acts) was done in furtherance of the railroad's objectives or that the company negligently hired, supervised, or failed to fire the employee who committed the tort.

Since the claimed injuries clearly and exclusively arose out of their employment by the Burlington Northern, the FELA provides to these plaintiffs the exclusive remedy for those claimed injuries. Even if that act afforded no remedy to these claims, the act is all comprehensive. *See, e.g. New York Central Railroad Co. v. Winfield,* 244 U.S. 147, 37 S.Ct. 546, 61 L.Ed. 1045 (1917). The purpose of Congress in enacting the Federal Employers' Liability Act, and the federal courts in construing it, is clearly to provide a uniform and exclusive compensatory program to govern claims made by employees against employing railroads for damages arising out of the employment relationship.

Accordingly, I would hold that the Federal Employers' Liability Act, 45 U.S.C. §§ 51–60 (1982) pre-empts an employee's claim of damage against a railroad employer when the claim arises from intentional infliction of emotional distress if the acts giving rise to the claim are committed solely and exclusively during the course of the employment relationship.

Therefore, I would affirm the district court in *Pikop v. Burlington Northern Railroad,* and would answer the certified question in *Gulati v. Burlington Northern Railroad Co.* in the affirmative.