Gerald HAAGENSON, and his wife, Jeanette Haagenson, Respondents,

v.

NATIONAL FARMERS UNION PROPERTY AND CASUALTY COMPANY, Appellant.

Nos. 48172, 48335.

Supreme Court of Minnesota.

March 23, 1979.

---

Peterson, Holtze & Treat, Theodore N. Treat Jr., and Todd Maxwell Henshaw, Minneapolis, for appellant.

Abrams & Spector and Mitchell R. Spector, Minneapolis, for respondents.

O'Connor & Hannan, Frank J. Walz and John B. Blatz, III, Minneapolis, for National Assn. of Independent Insurers, amicus curiae.

Hansen, Dordell & Bradt, St. Paul, for Minn. Assns. of Township Farm Mut. Ins. Cs., Inc., amicus curiae.

Rider, Bennett, Egan & Arundel, Richard J. Nygaard, William J. George, Minneapolis, for Farmers Ins. Group, amicus curiae.

O. C. Adamson, II and Mary Jeanne Coyne, Minneapolis, for Federated Ins. Companies of Owatonna et al., amicus curiae.

PETERSON, Justice.

Plaintiff Gerald Haagenson, owner of an automobile and a pickup truck, was insured by defendant, National Farmers Union Property and Casualty Company, under the Minnesota No-Fault Automobile Act, Minn.St. c. 65B. Plaintiff was seriously injured under unusual circumstances giving rise to a claim against defendant under the no-fault coverage of both vehicles; and, in addition, plaintiff (with his wife, plaintiff Jeanette Haagenson) made claims for damages for intentional infliction of emotional distress by nonpayment of his claims, and punitive damages.

A jury found that plaintiff's injuries were covered under the no-fault provision of the insurance contract on the pickup truck and, upon post-trial motion, the trial judge stacked the coverage of both vehicles,[1] in the total amount of $60,000. This we affirm. The jury made awards to plaintiff and his wife in addition, $50,000 for emotional distress and $300,000 as punitive damages. These we reverse, but remand for assessment of the 10-percent statutory penalty for delay in payment of no-fault benefits pursuant to Minn.St. 65B.54, subd. 2.

The facts upon which plaintiff's claims are based may be briefly stated. In the early morning hours of March 27, 1976, Dennis Crouch drove his automobile off a rural Fillmore County road, colliding with the power pole in an adjacent ditch. The pole broke and, with three powerlines intact, fell across the top of Crouch's automobile. Crouch walked to a nearby farm, where he telephoned his sister for assistance. His sister's husband, James Gordon, and plaintiff went to assist Crouch in Gordon's pickup truck, which Gordon drove.

On the way to the farm, Gordon and plaintiff stopped at the scene of the accident. Gordon stopped his truck on the right side of the roadway, still on the blacktop, a little east of the Crouch automobile, which had come to rest parallel to the road, about 15 feet into the adjacent ditch. Gordon and plaintiff were able to see the automobile to their right, illuminated by the truck's headlights. Opposite the passenger's side of the truck, the powerlines were 6 to 12 feet from the truck; the lowest powerline was 3 to 4 feet above the ground. The ditch was 2 to 3½ feet deep, sloping gently down from a narrow, 1-foot shoulder by the road. Dew or frost had formed on the grass in the ditch.

Because plaintiff had suffered amnesia concerning the details of the accident and because Gordon was the only other witness to it, the events which follow were as described by Gordon. After plaintiff got out of the truck and went into the ditch, he crawled upon his hands and knees to the Crouch automobile, looked inside, and called out that no one was there. In returning to the truck plaintiff, still crawling upon his hands and knees, disappeared from the area illuminated by the truck's headlights. Gordon then heard the passenger's door on the truck click and, out of the corner of his eye, saw the door move from halfway to completely open. Immediately after hearing the click and seeing the door move, Gordon heard plaintiff scream and then he saw a

---

1. An issue raised by defendant as to whether it is permissible to stack no-fault benefits was recently answered in the affirmative, *Wasche*

*v. Milbank Mut. Ins. Co.*, 268 N.W.2d 913 (Minn.1978), and need not be again considered.

flash. Gordon got out of the truck and found plaintiff unconscious under the powerlines, his head facing toward the truck, approximately 5 to 6 feet from the passenger's door.

As a result of the accident, plaintiff suffered serious injuries which required amputation of his legs. He remained hospitalized until June 2, 1976. Plaintiff's wife left her employment and since plaintiff's release from the hospital has stayed with him constantly to care for him. Plaintiffs testified that they were unable to pay plaintiff's hospital bills and relied upon help from relatives and friends for necessities.

Three days after the accident, plaintiff's wife made written application for no-fault benefits to defendant through its local agent. An accident notice was transmitted to defendant's claim office in St. Paul, Minnesota, arriving there on March 31, 1976. The claim manager in the St. Paul office arranged with the General Adjustment Bureau (GAB) of Rochester to investigate the accident. Defendant received reports from GAB on April 22, June 1, June 14, and July 23, 1976. The reports received on April 22 and June 14 recommended that plaintiff was entitled to no-fault benefits; none of these reports recommended that plaintiff was not entitled to benefits. Plaintiffs checked periodically with their insurance agent and learned defendant was not convinced that plaintiff's accident occurred while he was in contact with the Gordon truck. The conversations with the agent and statements taken of plaintiffs by the GAB adjuster were the only communications between defendant and plaintiffs. About 140 days after the accident, plaintiff retained an attorney who made a written demand upon defendant for payment. This action was brought shortly thereafter, in mid-August 1976, at which time defendant had neither rejected plaintiff's claim nor paid the no-fault benefits.

■ 1. We consider, first, the question of no-fault coverage. Minn.St. 65B.44, subd. 1, provides, in part:

"Basic economic loss benefits shall provide reimbursement for all loss suffered through *injury arising out of the maintenance or use of a motor vehicle* \* \* ." (Italics supplied.)

Minn.St. 65B.43, subd. 3, provides, in part:

" 'Maintenance or use of a motor vehicle' means maintenance or use of a motor vehicle as a vehicle, including, *incident to its maintenance or use as a vehicle, occupying, entering into, and alighting from it.*" (Italics supplied.)

The contested factual issue for the jury was whether plaintiff was injured while entering into a motor vehicle, while the vehicle was being used as a motor vehicle.

The deposition testimony of Gordon, the only witness able to remember what happened during the accident, supports an inference that plaintiff slipped while opening the passenger's door of the Gordon truck, lost his balance, and fell back into the powerline. Earlier statements made by Gordon to an insurance adjuster and to the investigating police officer substantially support the description of the accident in the Gordon deposition. Defendant contends Gordon gave conflicting descriptions of the accident, but credibility of witnesses and the weight of their testimony is for the jury to decide.

■ A finding that plaintiff was injured as he was entering the Gordon truck is not contrary to this court's decision in *Ostendorf v. Arrow Insurance Co.*, 288 Minn. 491, 182 N.W.2d 190 (1970). In that case, we held a girl struck 10 feet south of her father's automobile while crossing the street to the automobile was *not entering* her father's motor vehicle under the terms of the father's insurance policy.[2] Our holding in *Ostendorf* indicates "entering into" will be given its popular, ordinary, and plain meaning and that a person 10 feet

---

**2.** To be covered by the uninsured motorist coverage section of her father's policy, it was required that the daughter be "occupying" the motor vehicle. The policy itself defined "occu-

pying" to include entering the insured motor vehicle. *Ostendorf v. Arrow Insurance Co.*, 288 Minn. 491, 493, 182 N.W.2d 190, 191 (1970).

away from a vehicle is not "entering into" a motor vehicle for the purpose of deciding coverage under an automobile insurance policy even if that person intends to get into the vehicle once he reaches it. How close a person must be before he will be determined to be "entering into" a motor vehicle is a question of degree. In the present case, it is a permissible inference from the evidence that plaintiff grasped the door handle of the Gordon truck and, therefore, was close enough to the motor vehicle to be considered "entering into" it.

While the finding that a person is entering a motor vehicle will not establish in every case that an injury has "arisen out of the use of a motor vehicle," such a finding does establish the requisite causal connection in this case. We have interpreted the phrase "arising out of the use of a motor vehicle," as used in an insurance policy, to require that a causal relationship or connection exist between an injury and the use of a vehicle but that such relationship need not be a proximate cause in the legal sense, it being sufficient that the injury is a natural and reasonable incident or consequence of the use of the vehicle. *Associated Ind. Dealers v. Mutual Serv. Ins.*, 304 Minn. 179, 181, 229 N.W.2d 516, 518 (1975). For an injury to "arise out of the use of a motor vehicle," it must be related causally to the employment of the vehicle for transportation purposes. *Holm v. Mutual Service Cas. Ins. Co.*, 261 N.W.2d 598, 603 (Minn.1977). Implicit in the jury's finding that plaintiff was entering into the Gordon truck is a finding that plaintiff was entering with the intention of becoming a passenger for the purpose of proceeding to the farm. This finding meets the requirement that an injury be related causally to the employment of a vehicle for transportation purposes.

The findings in this case are distinguishable from those in *Associated Ind. Dealers v. Mutual Serv. Ins., supra; Holm v. Mutual Service Cas. Ins. Co., supra*, and *Engeldinger v. State Auto. & Cas. Underwriters*, 306

Minn. 202, 236 N.W.2d 596 (1975) (cases upon which defendant relies for reversal), for in none of those cases did the accident or injury occur while the vehicle was being used for transportation purposes.

2. We turn, then, to plaintiffs' recovery in tort against defendant for damages for the intentional infliction of emotional distress and for punitive damages because of defendant's nonpayment of the no-fault benefits under the insurance contracts with knowledge that defendant's refusal of payment caused severe financial hardship. We have consistently held, in the absence of specific statutory provision therefor, that extra-contract damages are not recoverable for breach of contract except in exceptional cases where the breach is accompanied by an independent tort. See, *Olson v. Rugloski*, 277 N.W.2d 385 (Minn.1979); *Moore v. John E. Blomquist, Inc.*, 256 N.W.2d 518 (Minn.1977); *Wild v. Rarig*, 302 Minn. 419, 440, 234 N.W.2d 775, 789 (1975), certiorari denied, 424 U.S. 902, 96 S.Ct. 1093, 47 L.Ed.2d 307 (1976); *Independent Grocery Co. v. Sun Insurance Co.*, 146 Minn. 214, 217, 178 N.W. 582, 583 (1920); *Beaulieu v. Great Northern Ry. Co.*, 103 Minn. 47, 50, 114 N.W. 353, 354 (1907).

Plaintiffs contend that defendant committed an independent tort because refusal to pay their claim under the insurance contracts was intentional, malicious, and in bad faith. Notwithstanding the jury's finding that such was defendant's conduct, it does not appear from the circumstances of the accident that the responsible officials of defendant insurance company had no reason whatever to contest plaintiffs' claim under the insurance contracts. Even assuming the contrary, however, our recent decisions in *Moore v. John E. Blomquist Inc., supra*, and *Wild v. Rarig, supra*, hold that such damages are not recoverable for bad-faith breach of contract. As expressed in the *Wild* case (302 Minn. 442, 234 N.W.2d 790): "A malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action." [3]

---

**3.** Restatement, Torts 2d, § 46, *comment d*, indicates that in jurisdictions where recovery is permitted for the independent tort of intentional infliction of emotional distress, the type of

Plaintiffs contend, as well, that because the terms of the automobile insurance contracts were mandated by the no-fault statute, an intentional breach of the contracts at the same time constitutes an intentional violation of the statute, itself sufficient to establish the requisite independent tort. This argument is not convincing. Plaintiffs cite no decisions which have held that an intentional breach of a statutorily mandated contract is an independent tort which will allow recovery of extra-contract damages.[4]

3. The no-fault act, however, does provide a form of remedy for nonpayment of insurance. Minn.St. 65B.54, subd. 1, provides, in part, that "[b]enefits are overdue if not paid within 30 days after the reparation obligor *receives reasonable proof of the fact and amount of loss realized  *  *  *"*; and subd. 2 provides that "Overdue payments shall bear simple interest at the rate of ten percent per annum." (Italics supplied.) We hold that a reparation obligor has received such reasonable proof when an insured has given reasonable notice of a possible claim of right.

Because the trial court granted recovery for emotional distress and punitive damages, it did not undertake to impose the statutory penalty. We accordingly remand to the trial court for the sole purpose of determining the earliest date plaintiff insured gave reasonable notice of a possible claim of right and to calculate the 10-percent penalty as of that date. It may well be, of course, that the parties can themselves agree upon the sum due without action by the court.

Affirmed in part; reversed in part and remanded.

OTIS, J., took no part in the consideration or decision of this case.

---

actionable conduct must be extreme and outrageous, so atrocious that it passes the boundaries of decency and is utterly intolerable to the civilized community.

4. Montana follows the position that punitive damages may be awarded where breach of an insurance contract is likewise a violation of the state insurance code. *State ex rel. Larson v. District Court of Eighth Jud. Dist.*, 149 Mont. 131, 423 P.2d 598 (1967). But even in Montana a breach of contract which also constitutes a statutory violation is not sufficient by itself to allow extra-contract damages; the acts or omissions of an insurer must also be oppressive, malicious, or fraudulent. *State ex rel. Cashen v. District Court of Thirteenth Jud. Dist.*, 157 Mont. 40, 45, 482 P.2d 567, 570 (1971). While some other jurisdictions have awarded extra-contract damages for breach of insurance contracts, these recoveries have been based on theories other than intentional violation of a statutorily mandated contract.