**STATE FARM MUTUAL AUTOMOBILE INSURANCE COMPANY, Appellant,**

v.

**Steven LEVINSON, as Special Guardian for Megan Mestery, Citizens Security Mutual Insurance Company, St. Paul Fire and Marine Insurance Company, Respondents.**

No. C7–88–1809.

Court of Appeals of Minnesota.

April 4, 1989.

Steven L. Marquart, Cahill & Maring, P.A., Moorhead, for State Farm Mut. Auto. Ins. Co., Appellant.

Kurt J. Marben, Charlson & Marben, P.A., Thief River Falls, for Steven Levinson, as Sp. Guardian for Megan Mestery, respondent.

George F. Vogel, Holst, Vogel, Erdmann & Vogel, Red Wing, for Citizens Sec. Mut. Ins. Co., respondent.

Paul E. Grinnell, Gunhus, Grinnell, Klinger, Swenson & Guy, Moorhead, for St. Paul Fire and Marine Ins. Co., respondent.

Heard, considered and decided by KALITOWSKI, P.J., and HUSPENI and CRIPPEN, JJ.

## OPINION

KALITOWSKI, Judge.

State Farm Mutual Automobile Insurance Company (State Farm) appeals a declaratory judgment action granted in favor of Steven Levinson, as special guardian for Megan Mestery, Citizens Security Mutual Insurance Company (Citizens Security), and St. Paul Fire and Marine Insurance Company (St. Paul Company). The trial court found that Megan Mestery had primary underinsured motorist coverage and basic economic loss benefits coverage from State Farm and secondary underinsured coverage from Citizens Security. The court further concluded that St. Paul Company's policy did not provide underinsured motorist coverage. We affirm.

## FACTS

Megan Mestery is the daughter of Dr. and Mrs. Donald Mestery. On October 5, 1984, Megan was struck by a vehicle owned and operated by Barbara Holthusen. Megan was three years old at the time of the accident. The parties stipulated that Megan's damages as a result of the accident exceed the liability insurance limits of $50,000 on the Holthusen vehicle.

On October 5, 1984, Dr. Donald Mestery was employed as a physician at the Falls Clinic in Thief River Falls, Minnesota. Under the terms of his employment, he was provided with a clinic-owned vehicle, a 1984 GMC Suburban. At that time, the Suburban was one of several vehicles insured by State Farm. The policy designated the Falls Clinic as the named insured and provided underinsured motorist coverage of $100,000 and no-fault coverage of $30,000.

On the day of the accident, Dr. Mestery was driving his Suburban with his son, Brent, in the middle seat and his daughter, Megan, in the third seat. His wife followed in the family car accompanied by their other son, Kyle.

On their way home, the Mestery's stopped at the home of some friends, the Breilands, who lived on Spruce Avenue on the Northeast corner of the intersection of Spruce and Gulf Street. Dr. Mestery parked the Suburban on the west side of Spruce, directly across the street from the home. When he parked, Dr. Mestery testified that he asked his son, Brent, if he was going to come in with him and his son indicated he would. Dr. Mestery then looked back at Megan and thought she was asleep. Dr. Mestery exited the vehicle through the front driver's door. Brent exited from the second door of the Suburban on the curb side and came around and met his father at the front of the vehicle.

June Mestery parked directly behind the Suburban. She and Kyle joined Brent and Dr. Mestery and they walked across the street to the sidewalk in front of the residence. As they began walking toward the residence they heard a screeching of brakes. Dr. Mestery turned and saw a vehicle stopped facing south in the intersec-

tion of Spruce and Gulf and Megan lying in the street.

Dr. Mestery testified that when he first observed Megan, she was lying perpendicular to the middle part of the Suburban on her right side with her head furthest away from the vehicle. Dr. Mestery believed her head was no more than about four feet from the Suburban. He testified that he went to pick her up and did not notice any blood until he took a few steps forward. He then laid her down and proceeded to check to see if she was breathing. He picked her up again and carried her to the front lawn of the Breiland home. Shortly after the accident, a police car drove by and Megan was immediately driven to the hospital in Thief River Falls.

After the accident, it was observed that the left rear door of the Suburban—the door facing the street—was ajar approximately three inches. That door was closed when Dr. Mestery and his son, Brent, left the vehicle.

During the police investigation, measurements were taken of the scene and a scale drawing was prepared. A pool of blood found on the street was measured to be 6' 11" from the left side of the Suburban. The police officer observed no evidence to indicate that Megan was struck anywhere on the roadway, other than where he saw the pool of blood.

### ISSUES

1. Did the trial court err in concluding that Megan Mestery was "alighting from" the vehicle and therefore covered under the State Farm automobile insurance policy?

2. Did the trial court err in concluding that State Farm's underinsured motorist coverage had first priority and Citizens Security underinsured motorist policy had second priority?

3. Did the trial court err in concluding that St. Paul Company's umbrella policy did not include underinsured motorist benefits?

### ANALYSIS

1. Alighting from a vehicle.

State Farm challenges the trial court's finding of fact that Megan Mestery was "alighting from" its insured vehicle at the time of her accident. Under the terms of the insurance policy issued by State Farm, this determination qualified Megan Mestery for underinsured motorist and no-fault insurance benefits.

The Falls Clinic is the named insured under the State Farm policy. Thus under the terms of the policy, the only way Megan Mestery is entitled to either underinsured coverage or no-fault coverage is to establish that at the time of the accident she was "occupying" the Suburban.

Under the policy occupying "means in, on, entering or alighting from." There is no contention that Megan was in, on or entering the Suburban at the time of the accident. Rather, the Mestery's claim is that she was "alighting from" the vehicle when she was struck.

A trial court's finding of fact will not be disturbed unless clearly erroneous. Minn.R.Civ.P. 52.01. A decision is not clearly erroneous unless it is demonstrated that it is without substantial evidentiary support or that it was based on an erroneous view of the law. *Minnesota Public Interest Research Group v. White Bear Rod and Gun Club*, 257 N.W.2d 762 (Minn. 1977). It is not an appellate court's function to weigh the evidence and determine the issues of fact. *Johnson v. Johnson*, 250 Minn. 282, 84 N.W.2d 249 (1957). *Butch Levy Plumbing & Heating, Inc. v. Sallblad*, 267 Minn. 283, 126 N.W.2d 380 (1964).

Appellant argues that Megan Mestery is not entitled to coverage because she had completed the act of alighting from the vehicle at the time of the accident. Appellant contends that in order to find that Megan Mestery was alighting from the vehicle, physical contact with the vehicle is necessary.

With regard to the meaning of the term "alighting from," the instant case is one of first impression. However, in other jurisdictions there are numerous cases inter-

preting identical language. *See generally* Annot., 59 A.L.R. 4th 149 (1988).

Other jurisdictions have developed two distinct lines of cases interpreting "alighting from," focusing on the presence or absence of physical contact. One line of cases requires "physical contact" for recovery. *See, e.g., Wolf v. American Casualty Co. of Reading, PA*, 2 Ill.App.2d 124, 118 N.E.2d 777 (1954); *Madden v. Farm Bureau Mutual Automobile Insurance Co.*, 82 Ohio App. 111, 37 Ohio Op. 456, 79 N.E.2d 586 (1948); *McAbee v. Nationwide Mutual Insurance Co.*, 249 S.C. 96, 152 S.E.2d 731 (1967). The other line of cases holds that "physical contact" alone is not the operative test for coverage. All courts considering this matter have uniformly interpreted such policy language bearing in mind the well established maxim that language in an insurance policy is to be strictly construed against the insurer. *See Atwater Creamery Co. v. Western National Mutual Insurance Co.*, 366 N.W.2d 271, 277 (Minn.1985).

Respondent argues that Minnesota should adopt the reasoning of other jurisdictions which have rejected the physical contact requirement in order to extend coverage. The Michigan Supreme Court rejected the physical contact requirement in *Nickerson v. Citizens Mutual Insurance Co.*, 393 Mich. 324, 224 N.W.2d 896 (1975). The court stated:

> If Defendant–Appellee's argument that there must be a physical touching of some part of the auto were to prevail, the following situation with on again off again coverage could be easily imagined. While getting out of the auto, a person would be an occupant and covered; after closing the door but still touching it, there would be coverage; after removing his hand from the door there would be no coverage; while walking to the front of the auto, there would be no coverage; after arriving at the front of the auto, and placing his hand on the front hood, there would be coverage again; after removing his hand from the front hood, there again would be no coverage. This undoubtedly is the sort of thing the dissent in the Court of Appeals was refer-

ring to when stating that the touching or not touching is a mere fortuitous event. *Id.* at 899; *see Robson v. Lighting Rod Mutual Insurance Co.*, 59 Ohio App.2d 261, 13 Ohio Op.3d 268, 393 N.E.2d 1053 (Ohio Ct.App.1978) (rejecting the physical contact rule as an arbitrary rule which may result in the frustration of coverage in bona fide cases); *see also Day v. Coca Cola Bottling Co., Inc.*, 420 So.2d 518 (La. Ct.App.1982) (physical contact rule inconsistent with other terms of insurance contracts).

We agree with the analysis of the jurisdictions rejecting the physical contact requirement. Requiring physical contact would be inconsistent with other policy language contained in insurance contracts and more importantly would deny coverage in situations where the contact is nothing more than a fortuitous event. The better approach is to follow our supreme court's analysis in cases where no-fault coverage depended on a determination as to whether a person was "entering into" a vehicle.

In *Haagenson v. National Farmers Union Property and Casualty Co.*, 277 N.W. 2d 648 (Minn.1979), the supreme court considered the meaning of "entering into" a vehicle within the context of Minnesota's no-fault law. In *Haagenson*, the plaintiff was electrocuted after he and a friend had driven to the scene of an accident where a car had collided with a power pole and downed some electrical lines. Haagenson had gone to the vehicle to see if anyone was inside and after finding it to be unoccupied returned to the truck. A passenger testified that he heard a click and saw the passenger door of the truck open. Immediately after the door moved, the driver heard Haagenson scream and saw a flash. Haagenson was found unconscious approximately five to six feet from the truck beneath the electric lines. Haagenson claimed he was entitled to no-fault benefits because he had been "entering into" a vehicle at the time of his injury. A jury agreed and on appeal the supreme court held:

How close a person must be before he will be determined to be "entering into" a motor vehicle is a question of degree. *Id.* at 652.

*Haagenson* emphasized that the decision was not contrary to the decision in *Ostendorf v. Arrow Insurance Co.*, 288 Minn. 491, 182 N.W.2d 190 (1970). In *Ostendorf*, the court held a girl struck 10 feet south of her father's automobile while crossing the street to the automobile was not entering her father's vehicle under the terms of the father's insurance policy. The *Haagenson* court stated:

"entering into" will be given its popular, ordinary, and plain meaning and that a person 10 feet away from a vehicle is not "entering into" a motor vehicle for the purpose of deciding coverage under an automobile insurance policy even if that person intends to get into the vehicle once he reaches it.

*Haagenson*, 277 N.W.2d at 651–52. The court went on to state that the relationship between the injury and the use of the vehicle need not be a proximate cause in a legal sense, but rather that it is sufficient if the injury is a natural and reasonable incident or consequence of the use of the vehicle. Under this approach, "alighting from" a vehicle is a question of degree.

In further support of the argument that Megan was not alighting from the vehicle appellant cites *Fidelity & Casualty Company of New York v. Garcia*, 368 So.2d 1313 (Fla.Dist.Ct.App.1979), *pet. for rev. denied* 378 So.2d 344 (Fla.1979). In that case, Garcia had been a passenger in a truck. The driver of the truck had stopped his truck and Elsa Garcia exited from the right-hand side passenger door and crossed directly in front of the truck toward the direction of her home. After crossing in front of the truck and as she was walking toward her home, Garcia was struck by a motor vehicle attempting to pass the stopped truck on the left-hand side of the vehicle.

The question arose whether Garcia was occupying the stopped truck at the time of the accident. "Occupying" was defined to include "alighting from." The trial court concluded that Garcia was still in the process of alighting from the truck when the accident occurred. The appellate court disagreed, stating as follows:

On the other hand, there must be a limit to the activity that can be said to be a part of "alighting from." * * * We think that a rational limit to the activity that may be said to be encompassed within the term "alighting from" is the time and place at which the insured shows an intention, evidenced by an overt act based on that intention, to undertake a new direction or activity.

*Garcia*, at 1315 (citations omitted).

Appellant's reliance on *Garcia* is misplaced. Unlike this case, the evidence in *Garcia* establishes eyewitness testimony to trace every step taken by the injured party prior to and during the incident thus enabling the court to determine precisely when Garcia had finished "alighting from" the vehicle. Moreover, we think *Garcia* supports our holding that the determination of whether a person is "alighting from" a vehicle is a question of degree to be determined based on all the evidence.

In the present case, there was testimony that Megan got out of the rear left passenger door of the vehicle facing traffic and was struck just outside of that door. Her father testified that she may have taken no more than a step from the door when she was hit. No one can say exactly how the accident occurred. Testimony showed that the door was ajar and it could be inferred that Megan was closing the door when she was struck. The driver of the vehicle that struck Megan never saw her. Thus it was a factual issue as to whether Megan Mestery was injured while alighting from the vehicle and it was not clearly erroneous for the trial court to find that she was.

2. Priority of coverage.

The trial court concluded that State Farm's underinsured coverage was primary over that of Citizens Security because the State Farm policy insured the vehicle which Megan Mestery occupied at the time of the

accident and thus, was closer to the risk than the Citizens Security policy.

Since the facts are essentially undisputed, this court need only review the trial court's application of the law in interpreting the language of the two insurance contracts. *See Iowa Kemper Insurance Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978).

To reach the conclusion that it did, the trial court determined that as applied to this accident the State Farm "other insurance" clause was a pro rata clause and the Citizens Security "other insurance" clause was an excess clause. Our review of the clauses leads us to the conclusion that the trial court did not err in its interpretation.

In Minnesota, coverages for a given risk shall be "stacked" for payment in the order of their closeness to the risk. *Integrity Mutual Insurance v. State Auto & Casualty Underwriters Insurance Co.*, 307 Minn. 173, 175, 239 N.W.2d 445, 447 (1976). In *Integrity*, the supreme court explained that the better approach is to "allocate respective policy coverages in light of the total policy insuring intent, as determined by the primary policy risks upon which each policy's premiums were based and as determined by the primary function of each policy." *Id.* at 446. In *Integrity*, the court also found that an excess clause and a pro rata clause do conflict. *Id.* at 447. *See Auto Owners Insurance Co. v. North Star Mutual Insurance Co.*, 281 N.W.2d 700, 704 (Minn.1979) (three-part test for determining "closest to the risk" doctrine).

In this case, the three-part "closest to the risk" test is the appropriate analysis in light of the policies insuring intent, the facts regarding the accident and the policies' "other insurance" clauses.

State Farm also argues that in *Interstate Fire & Casualty Co. v. Auto–Owners Insurance Co.*, 433 N.W.2d 82 (Minn.1988) the supreme court abandoned the closest to the risk doctrine. We do not read the case so broadly. Rather, we note that in *Interstate*, the court limited its analysis to the specific facts when it held, *"in this case,* rather than applying the three-part 'closest-to-the-risk' test, it is more helpful to use the broader approach set out in *Integrity."*

*Id.* at 86 (emphasis added). Moreover, *Interstate* did not deal with automobile insurance carriers as was the case in *Integrity* which established the "closest-to-the-risk" doctrine to address differing auto insurance coverages.

### 3. St. Paul Umbrella Policy.

The dispute in this issue is between St. Paul Company and Citizens Security as to whether the St. Paul Company's umbrella policy provides underinsured motorist coverage. Again the facts are essentially undisputed so this court need only review the trial court's application of the law in interpreting the language of the insurance contract. *See Iowa Kemper Insurance Co. v. Stone*, 269 N.W.2d 885, 887 (Minn.1978).

The heart of this dispute is the interpretation of St. Paul Company's policy. St. Paul argues that its policy is an excess personal liability policy, not a no-fault policy. The St. Paul policy specifically excludes uninsured motorist coverage and no-fault coverage.

Citizens Security argues that since the St. Paul policy does not specifically exclude underinsured motorist coverage the policy is ambiguous and should be strictly construed against the insurer.

■ In Minnesota, the rule in insurance cases involving a dispute as to the existence of optional underinsured motorist coverage between April 12, 1980, and October 1, 1985, is that where the language of the insurance policy is unambiguous and no mention of underinsured motorist coverage is made anywhere in the policy, the trial court may not construe the policy to provide coverage which the insurer did not anticipate and for which no specific premium was paid. *Hauer v. Integrity Mutual Insurance Co.*, 352 N.W.2d 406 (Minn. 1984); *Warren v. American Family Mutual Insurance Co.*, 418 N.W.2d 526 (Minn. Ct.App.1988), *pet. for rev. denied* (Minn. April 15, 1988).

■ Nowhere in St. Paul's policy is there any mention of underinsured motorist coverage. The terms of the policy show that Dr. Mestery, the policy purchaser, paid no

underinsured motorist premiums. The policy was purchased in 1983 and in effect from December 14, 1983, until December 14, 1984. The accident occurred on October 5, 1984. These facts show that neither St. Paul nor Dr. Mestery anticipated that the policy would provide underinsured motorist coverage.

Unlike uninsured motorist coverage, underinsured motorist coverage was not a part of the No–Fault Act governing automobile policies in 1983 and 1984. Minn. Stat. §§ 65B.49, Subd. 6(e) (repealed April 12, 1980), 65B.49, Subd. 3a (effective October 1, 1985). Underinsured motorist coverage between April 12, 1980, and October 1, 1985, was completely optional and its existence or nonexistence was a matter of contract. Therefore, insurance carriers had no need to list underinsured motorist coverage as a specific exclusion in the "Exclusions" sections of their policies to avoid providing underinsured motorist coverage to those who had not contracted for it. *See Pedersen v. United Services Automobile Association*, 383 N.W.2d 427 (Minn.Ct.App.1986) (underinsured motorist coverage should not be read into an automobile policy which did not explicitly provide for it); *see also Warren v. American Family Mutual Insurance Co.*, 418 N.W.2d 526 (Minn.Ct.App. 1988) (specific policy did not provide underinsured motorist coverage since no premium was paid and no underinsured motorist coverage was listed in the declaration), *pet. for rev. denied* (Minn. April 15, 1988).

## DECISION

The trial court was correct in finding that Megan Mestery was "alighting from" the State Farm insured vehicle at the time of the accident even though no physical contact with the vehicle was shown. Further, the trial court correctly apportioned the loss among the respective insurance carriers and properly found St. Paul Company's umbrella policy did not include underinsured motorist coverage.

Affirmed.