OTIS ELEVATOR CO., Plaintiff,

v.

FACTORY MUTUAL INSURANCE CO., Defendant.

Civil No. 3:03cv1231(JBA).

United States District Court, D. Connecticut.

Jan. 25, 2005.

Daniel L. FitzMaurice, Deborah Skelley Russo, Maureen O'Connor, Day, Berry & Howard, Hartford, CT, for Plaintiffs.

Christopher R. Paar, Mark J. Feinberg, Thomas B. Caswell, Zelle, Hofman, Voelbel, Mason & Gette, Minneapolis, MN, Erik Loftus, Law Offices of Stuart G. Blackburn, Justin J. Donnelly, Sr., Stuart G. Blackburn, Windsor Locks, CT, for Defendants.

### RULING ON CROSS–MOTIONS FOR SUMMARY JUDGMENT [DOCS.#56, 61]

ARTERTON, District Judge.

The parties to this insurance lawsuit dispute whether coverage is due to Plaintiff Otis Elevator Company (Otis) under a Factory Mutual (FM) insurance contract for property damage that resulted from an accident at the Minneapolis–St. Paul airport during installation of an automated people mover. This Court's diversity jurisdiction has been invoked under 28 U.S.C. § 1332. Otis's two-count complaint claims (1) breach of the insurance contract and (2) breach of the covenant of good faith and fair dealing. *See* Complaint [doc. # 1] ¶¶ 37–42.[1] FM's motion for summary judgment addresses both counts [doc. # 56] and Otis's cross-motion for summary judgment is directed to its breach of contract count [doc. # 61]. Oral argument on both motions was held on January 18, 2005. For the reasons that follow, Factory Mutual's motion is granted as to the bad faith count (Count Two) and denied as to the breach of contract count (Count One). Otis's motion for summary judgment on Count One is granted.

## I. FACTUAL BACKGROUND

The material facts of this case are undisputed. Otis is a New Jersey corporation with its principal place of business in Farmington, Connecticut. FM is a Rhode Island corporation with its principal place of business in Johnston, Rhode Island.

In 1999, Otis entered into a contract with the Metropolitan Airport Commission (MAC) to build an Automated People Mover (APM) along the length of the new "C" Concourse at the Minneapolis–St. Paul Airport, also known as the "Green" Concourse. The APM is a two-way tram system, with each tram composed of two cars pulled along on a moving cable.

### A. The Collision

By July 2002, the cars had been custom manufactured off site and delivered to the airport, and Otis was installing the APM system. Otis subcontracted some of the installation and testing work to GE Fanuc Automation Company, which employed a Programming Services Engineer named Jeffrey Miller. *See* FM L.R. 56(a) Stmt. Ex. 3. On July 22, 2002, Miller was testing the brakes of the APM system pursuant to an Otis protocol that required monitoring the stopping distances of the APM cars in "over load" conditions, simulated by placing barrels of water in the tram cars until they were at 150% of maximum operating capacity. The tram system has two sets of brakes, primary and secondary. The goal of the tests was to ensure that the brakes would stop the APM within specified distances at certain speeds. The brakes are not on the tram cars themselves, but on the drive motor that pulls the cable to which the cars are attached. Before the collision, the brakes already had been tested independently, without the tram cars, to ensure they would slow the motor.

Miller successfully conducted the first "over travel" tests at varying speeds, confirming that both the primary and secondary brakes were functioning correctly near the east tram stations. When the system

---

1. Otis's complaint contains duplicate paragraphs 37–40.

was being tested at higher speeds near the second-most westerly station, however, the primary braking system did not stop within the required distance, and the APM's computer system activated the secondary brakes. To eliminate the assistance being provided by the secondary brakes, Miller changed the computer program and disabled them, contrary to the protocol.

Further tests confirmed that the primary brakes were not functioning as expected, testing of them was suspended, and testing of the secondary brakes was begun. Miller disabled the primary brakes and, according to the test protocol, the secondary brakes should have been engaged at that point. However, Miller neglected to reprogram the computer from his previous test to engage the secondary brakes. As a result, the tram had no working brakes.

The protocol called for Miller to test the tram's stopping location beginning at a slow speed and then increase the speed for subsequent tests. Instead, Miller began moving the tram at the highest speed.[2] As a result, the tram, loaded to 150% capacity, operating without functioning brakes and at highest speed, crashed into the restraining buffer at the terminal end of the tracks. The two trams cars, the buffer, and the terminal wall were damaged.

Otis incurred approximately $2 million in property damage expenses to repair the tram and the buffer, and the company also was required to pay liquidated damages of about $1.5 million under the contract with MAC for the consequent delay in completing the project.

## B. The MAC Insurance Policy

The Otis–MAC contract required MAC to provide insurance coverage for Otis and the APM project "on an All Risk basis in accordance with the conventional All Risk Builder's risk form currently in use."[3] Pollard Aff., 8/17/04, ¶ 4. MAC listed Otis as an additional insured on its All–Risk Policy with Factory Mutual, number FR043. The policy was negotiated between MAC and FM, and the premiums paid, in Minnesota. The policy provides:

> This Policy covers property, as described in this Policy, against ALL RISKS OF PHYSICAL LOSS OR DAMAGE, except as hereinafter excluded, while located as described in this Policy.

FM's L.R. 56(a)(1) Stmt. Ex. 9 at 25. It is undisputed that Concourse C, the site of the new APM and the damage, was a covered location under the policy.

On July 29, 2002, approximately one week after the crash, MAC sent FM a notice of potential claim for first party property coverage for the damage to the terminal building, and informed FM that Otis might also file a claim for coverage under the policy. On November 5, 2002, Otis filed its claim, seeking reimbursement for the damage to the APM as well as for its contractual liquidated damages.[4] FM General Adjuster David Hess, based in Minnesota, conducted an inspection and handled the Otis claim.

After a series of discussions between Hess and Bryan Pollard, Otis's in-house counsel in Connecticut, Hess denied the

---

2. It is unclear, but immaterial, whether Miller was intending to begin another test at that point or whether he only intended to move the tram to a different location to begin a new test.

3. The parties have not submitted this portion of the Otis–MAC contract as part of the record. *See* FM L.R. 56(a) Stmt. Ex. 2.

4. Otis makes no claim of FM in this litigation for the delay damages assessed under the contract with MAC.

claim by letter dated April 8, 2003. *See* FM's L.R. 56(a)(1) Stmt. Ex. 18. The letter cited what the parties call the "C–1" and "C–2" exclusions to the MAC insurance policy:

C. This Policy excludes the following, but if physical damage not excluded by this Policy results, then only that resulting damage is insured:

1) faulty workmanship, material, construction or design from any cause.

2) loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being processed, manufactured, tested, or otherwise worked on.

*Id.*, Ex. 9 at 25.

FM took the position that Miller's action in disengaging both sets of brakes on the APM system was "faulty workmanship" excluded under section C–1, and that the damage to the tram cars and buffer were "loss or damage to stock or material attributable to manufacturing or processing operations while such stock or material is being ... tested," as excluded by section C–2. The parties agree that the policy itself does not define "faulty workmanship," "stock," "material," "manufacturing or processing operations," "processed," "manufactured," "tested," or "otherwise worked on."

## C. The UTIV Insurance Policy

Otis, which is a subsidiary of United Technologies, also was insured by that company's captive insurer, United Technologies, Inc. of Vermont (UTIV). The UTIV policy has a deductible of $2 million and a limit of liability of $10 million (according to Otis) or $1.5 billion (according to FM). UTIV does not have its own employees and the policy is, coincidently, administered by FM. The UTIV policy has a "faulty workmanship" exclusion, which is essentially the same as that in the FM policy. As administrator of the UTIV policy, FM took the position that the UTIV policy covered the damage to the trams because the policy was meant to broadly cover "testing." Under the UTIV policy, FM found that the "resultant impact damage to the Tram" was recoverable but the cost of fixing any brake problems discovered by the testing would not be recoverable. Pollard Aff. Ex. 5.

Both the UTIV and MAC policies contain "other insurance" clauses, which both parties agree are in conflict, providing that if any other insurance would apply in the absence of the policy, such other insurance would apply first.[5] FM takes the position that the UTIV policy should apply first, and therefore that no coverage is available to Otis under the "other insurance" provision of the MAC policy, although Hess's denial letter of April 8, 2003 did not cite the "other insurance" clause as a basis for denial. *See* FM's L.R. 56(a)(1) Stmt. Ex. 18. Otis contends that the structure of the UTIV policy indicates that it was intended to be backup insurance only, and that the MAC policy applies first.

## II. STANDARD

Summary judgment is appropriate where "there is no genuine issue as to any

---

**5.** The FM Other Insurance clause reads: "If there is any other insurance that would apply in the absence of this Policy, this Policy will apply only after such insurance whether collectible or not.... In no event will this Policy apply as contributing insurance."

The UTIV clause reads: "Except for insurance described [in other clauses], this policy shall not cover to the extent of any other collectible insurance, whether directly or indirectly covering the same property against the same causes of loss. This Company shall be liable for loss or damage only to the extent of that amount in excess of the amount recoverable from such other collectible insurance." Otis L.R. 56(a)(1) Stmt. ¶¶ 15, 19.

material fact and ... the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). An issue of fact is "material" if it "might affect the outcome of the suit under the governing law," and is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986).

On cross-motions for summary judgment "neither side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it. When faced with cross-motions for summary judgment, a district court is not required to grant judgment as a matter of law for one side or the other." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir.1993) (citing *Schwabenbauer v. Bd. of Educ. of Olean*, 667 F.2d 305, 313 (2d Cir.1981)). "Rather, the court must evaluate each party's motion on its own merits, taking care in each instance to draw all reasonable inferences against the party whose motion is under consideration." *Schwabenbauer*, 667 F.2d at 314.

## III. BREACH OF CONTRACT

The parties have cross-moved for summary judgment on the issue of whether coverage is barred by any exclusions in the MAC policy.

### A. Choice of Law

The parties agree that Minnesota and Connecticut follow the same rules for interpretation of insurance contracts. Thus no choice of law analysis is necessary for Count One. *Haymond v. Statewide Grievance Comm.*, 45 Conn.Supp. 481, 723 A.2d 821, 826 (1997) ("It is only after a determination is made that there is indeed an actual conflict of laws of the particular jurisdictions that the interests of the respective jurisdictions are analyzed.")

### B. Faulty Workmanship Exclusion

■ Since damage or loss to Otis's property at the airport construction site is the subject of an all risk policy, FM bears the burden of demonstrating that the coverage claimed is subject to one of the exclusions in the contract. *See Henning Nelson Const. Co. v. Fireman's Fund Am. Life Ins. Co.*, 383 N.W.2d 645, 652 (Minn.1986); Janet L. Brown, *Application of Builders Risk Insurance to Defective Construction*, in *Insurance Coverage for Defective Construction*, 43 (Thomas W. Johnson, ed. 1997) ("Under ... all risks coverages, it is the burden of the insured to establish a loss sustained which apparently comes within the terms of the policy; and, then, the insurer must move forward and establish that the cause is excluded from coverage.").

FM argues that engineer Jeffrey Miller's "act of sending the overloaded APM tram into the buffer at the end of the track, at an improperly high speed, without any operating brakes whatsoever, constitutes faulty workmanship" excluded under section C–1 of the policy. FM Mem. of Law [doc. # 57] at 11. In support of this argument, FM relies on the testimony of another engineer involved in the APM testing, Jay Dorsey, who stated varying that he believed that improper brake settings constituted faulty workmanship, as well as that the collision was caused by human error and not by faulty workmanship. Dorsey Dep. at 62–63.[6] Dorsey's

---

6.
> Q. Was there anything wrong with the software itself that caused the collision?

A. No.

use of the term, however, is not within the context of the insurance policy, and certainly not intended to provide a policy definition.

FM relies primarily on two cases as support for its position. In *Schultz v. Erie Insurance Group*, 754 N.E.2d 971, 977 (Ind.Ct.App.2001), the term "faulty workmanship" was construed in the context of a homeowners' insurance policy,[7] and found unambiguous: "at the very least [faulty workmanship] signifies a component of the building process leading up to a finished product." *Id.* at 976–77. In *Kroll Construction Co. v. Great American Insurance Co.*, 594 F.Supp. 304, 305 (N.D.Ga. 1984), deficiencies in a subcontractor's "waterproofing materials and/or work" required costly corrections by the general contractor. The court interpreted a policy similar to the MAC policy:

> The term workmanship is not ambiguous; it simply means "the execution or manner of making or doing something." Webster's Third New International Dictionary, 2635 (4th ed.1976). "Faulty or defective workmanship," then, means the faulty or defective execution of making or doing something. There is no question that the subcontractor in this case defectively executed its craft of waterproofing...

*Id.* at 307.

Otis maintains that "faulty workmanship" is an ambiguous term, citing *Allstate Insurance Co. v. Smith*, 929 F.2d 447 (9th Cir.1991), which construed an all-risk business property insurance policy[8] on a doctor's office, where equipment was rain-damaged when a roofing contractor removed a portion of the roof but failed to put a cover the resulting opening. *Id.* at 449. The Ninth Circuit concluded that whether the exclusion for "faulty workmanship" covered the contractor's failure to cover the exposed premises was ambiguous because the term was susceptible to at least two interpretations: "flawed process," and a "flawed product." *Id.* at 450. Thus the ambiguity was construed in favor of the insured, as required under California law. Considering surrounding policy language and various dictionary definitions, the "flawed product" interpretation

Q. Was there anything wrong with the brakes themselves that caused the collision?
A. No.
Q. *So is it fair to say that the collision was caused by a human error?*
A. *Yes.*
Q. *And not by faulty workmanship?*
A. *Yes.*
...
Q. The proper setting of ... those various [testing] conditions was part and parcel of [Miller's] job duties?
A. Yes.
Q. It was his responsibility?
A. Yes.
Q. His workmanship?
A. Yes.
Q. So, if he sets the functions wrong, sets the brakes wrong, sends the car too fast, *is that faulty workmanship by him?*
A. *Yes.*

Dorsey Dep., FM L.R. 56(a)(1) Stmt. Ex. 4, at 62–63 (emphasis supplied).

7. The applicable policy excluded losses "caused by, resulting from, contributed to or aggravated by faulty or inadequate ... design, development of specifications, workmanship, construction ... of property whether on or off the residence premises by any person, group, organization, or governmental body if any peril excluded by this policy contributes to the loss in any way." *Schultz*, 754 N.E.2d at 973. The case involved an unlicensed home repair contractor who punctured a septic pipe, tore siding off a house with a backhoe, made shoddy repairs that would cause pipes to freeze and electrical wires to catch fire, and damaged the homeowner's personal property. *Id.*

8. The policy excluded "faulty, inadequate or defective ... design, specifications, workmanship, repair, construction, renovation..." *Allstate*, 929 F.2d at 449.

was found reasonable, and the property damage caused by the roofer's dereliction was not deemed faulty workmanship since the roofer had not completed any portion of the new roof and thus there was no flawed product. *Id.*

██ Neither FM nor Otis cites any state court decisions from Minnesota or Connecticut defining "faulty workmanship" in an insurance policy, and the Court finds none.[9] Under principles of insurance contract interpretation in both Connecticut and Minnesota, an insurance policy "must be construed as a whole" and in the context of the particular case. *Henning Nelson*, 383 N.W.2d at 652; *see also Zenon v. R.E. Yeagher Mgmt. Corp.*, 57 Conn.App. 316, 748 A.2d 900, 905 (2000) (the "object of the court is to construe the contract as a whole, in a reasonable and practical way, consistent with its language, background, and purpose.").

Applying these rules of construction, the term "faulty workmanship" does not encompass the damage at issue. The tram itself was not faulty workmanship in the sense of a "flawed product" because it already had been completed at the time of the accident.[10] The tram was not a "flawed process" because the construction of the tram already was complete, even if it had not actually been accepted by MAC, at the time of the accident. By either definition of "faulty workmanship," defendant's claim that the tram is faulty workmanship when sent at full speed, overloaded and without brakes, is forced. The accidental property damage to the tram

cannot be termed "faulty workmanship." It is simply accidental damage resulting from subcontractor negligence unrelated to the quality of any product or process.[11] *See City of Burlington v. Hartford Steam Boiler Inspection & Ins. Co.*, 190 F.Supp.2d 663, 672 (D.Vt.2002) (holding "faulty workmanship" cannot be read to encompass "accidental damage to the product caused by the builder's negligence during construction."). As one court has observed, "if subcontractor-fault were entirely excluded as a covered peril, the 'all risks' peril expressly insured would become perilously close to a policy insuring no risk." *Dow Chem. Co. v. Royal Indemnity Co.*, 635 F.2d 379, 387 (5th Cir.1981).

Further, viewing the "faulty workmanship" exclusion in light of the policy's overall purpose, the insureds, MAC and Otis, were reasonable in their expectation that accidents caused by subcontractor negligence at the MAC site, which caused property damage, would be covered under the policy language. Even though MAC's all-risk property policy covered MAC's property, Otis was a named additional insured, such that it would be reasonable for those parties both to expect to be covered against the risk of loss or physical damage to property belonging to either entity during the concourse construction project. At the same time, costs to repair defects in Otis's end product, the APM, which it contracted to install to certain specifications, would not be expected to be covered because of the faulty workmanship exclusion language.

---

9. One federal district court in Minnesota has followed *Smith* in a case concerning rain damage to a school construction site. *See M.A. Mortenson Co. v. Indemnity Ins. Co. of N. Am.*, No. Civ.98–2319(RHK)(JMM), 1999 WL 33911358 at *9 (D.Minn. Dec. 23, 1999) (unpublished).

10. FM does not claim that the overtravel experienced in the testing before the accident was "faulty workmanship."

11. Testing cannot here be deemed a "process" within the meaning of the faulty workmanship exclusion, as that term is expressly and only used in the C–2 exclusion. *Infra* at § III.C.

FM has not met its burden of showing that the C–1 "faulty workmanship" exclusion precludes coverage under the MAC policy. Its claim—that the tram sent at full speed, overloaded and without brakes constitutes faulty workmanship such that the damage to the APM is not a covered loss—distorts both the reasonable meaning of the "faulty workmanship" policy language as well as the policy's contextual purpose. Therefore Otis is entitled to summary judgment on this issue and FM is not.[12]

## C.  Testing Exclusion

FM maintains that the Clause C–2 "testing" exclusion precludes coverage for the damaged tram. That exclusion applies to "loss or damage to *stock or material* attributable to *manufacturing or processing operations* while such stock or material is being processed, manufactured, *tested, or otherwise worked on.*" FM's L.R. 56(a)(1) Stmt. Ex. 9 at 25 (emphasis supplied). FM's argues that because the APM system had not been completed and accepted by the MAC, it constituted Otis's stock or material that was being tested when damaged. It further contends that Otis was still "processing" or "manufacturing" the APM system at the time of the collision when the entire system was being tested, such that the C–2 exclusion applies.

### 1.  Definition of "Stock"

■ The policy does not define the terms of the exclusion, so FM has supplied its own definitions. It contends that "stock" is "equipment, materials or sup-

plies of an establishment... a store or supply accumulated... the inventory of goods of a merchant or manufacturer." FM Mem. in Support of Mot. for Summary Judgment [doc. # 57] at 5. FM contends that "conveyance devices" such as elevators and APMs are Otis's "stock in trade" because they are the type of equipment that Otis regularly provides to its customers.

While Otis agrees essentially with this definition of stock, it argues that the term does not apply to the tram cars because "stock" means "inventory," which, in turn, courts have defined as "fungible" items or goods. *See, e.g., McCormick & Co. v. Empire Ins. Group,* 690 F.Supp. 1212, 1213 (S.D.N.Y.1988) ("... 'inventory' ...assumes a *fungible* item added to and subtracted from the *stock in trade* of a regularly conducted business and counted or recounted by taking inventory at the end of an accounting period.") (emphasis supplied). The trams are not inventory, Otis argues, because they were custom manufactured to unique specifications for the Minneapolis airport and Otis does not keep any stock or inventory of trams on hand for sale.

*Webster's Third New International Dictionary* 2246–47 (1993), provides the following relevant definition of "stock": "a quantity of something accumulated for future use: a store or supply to be drawn upon;" "used or employed for constant service or application as if constituting a portion of a stock or supply: kept regularly in stock or ready for sale or for immediate use;" "... suggesting something regularly

12.  Although the Court has found that the C–1 clause unambiguously does not exclude coverage for the damage at issue, even if the language of the exclusion were found ambiguous, the doctrine of *contra proferentem* would mandate an identical result, *i.e.,* summary judgment in Otis's favor. *See Israel v. State Farm Mut. Auto. Ins. Co.,* 259 Conn. 503, 789 A.2d 974, 977 (2002) (*contra proferentem* states that "ambiguities in contract documents are resolved against the party responsible for its drafting; the policyholder's expectations should be protected as long as they are objectively reasonable from the layman's point of view....").

kept in or as if in stock or ready for use . . . ." *Merriam Webster's Collegiate Dictionary* (10th ed.1994) contains the following definition: "the equipment, materials or supplies of an establishment" and "a store or supply accumulated," especially "the inventory of goods of a merchant or manufacturer."

Based on these dictionary definitions and the parties' definitions, the concept of "stock" as something "regularly kept" does not apply to the tram cars. The trams at issue were not on hand for use or sale upon customer request, but were unique products custom manufactured and installed as part of the entire APM system for the Minneapolis Airport Commission. *See* Aff. of Jason W. Philhower, 8/17/04, ¶ 4 ("MAC hired Otis to custom-design and build" the APM.).

### 2. Definition of "Material"

■ FM argues alternatively that if the tram cars are not stock, they are "material" as used in the C–2 exclusion. Again, the parties agree on a basic definition of material as being an element or constituent substance of a larger item. *See* FM Mem. in Support at 5 ("Material" . . . means "the elements, constituents, or substances of which something is composed or can be made.") (quoting *Merriam Webster's Collegiate Dictionary* ). The parties disagree over whether the tram cars can be considered material.

Applying this definition, since the tram is the completed machine, it cannot be a component of itself and thus cannot be "material." Nor is the tram a substance or constituent of the APM, any more than the APM is a constituent "material" of the concourse. It is an unreasonable artifice to interpret either "stock" or "material" to

encompass Otis's tram, and thus the C–2 testing exclusion does not apply. Accordingly, Otis is entitled to summary judgment on this issue and Factory Mutual's motion for summary judgment on the grounds of the C–2 exclusion must be denied.[13]

### C. Other–Insurance Clause

■ FM asserts as an affirmative defense that the other-insurance clause of the MAC policy requires the UTIV policy to pay out first for damage to the APM system. *See* First Amended Answer [doc. # 18], Fourth Affirmative Defense. While FM has not moved for summary judgment on this defense, Otis has.

The parties agree that the other-insurance clauses of the MAC and UTIV policies conflict, and that in case of a conflict the question presented is which insurance policy, if any, has the "primary purpose" of insuring the risk at issue. *Integrity Mut. Ins. Co. v. State Auto. & Cas. Underwriters Ins. Co.*, 307 Minn. 173, 239 N.W.2d 445, 447 (1976). The contract between Otis and MAC expressly required MAC to obtain builder's risk coverage for Otis for this construction project. Pollard Aff., 8/17/04 at ¶ 4. MAC requested such builder's risk coverage from FM on August 18, 1999 for "Green Concourse APM–Equipment," with Otis listed as the contractor. FM L.R. 56(a)(1) Stmt. Ex. 12. Although, as FM argues, the MAC policy was purchased by MAC to insure its own property, the additional insurance request makes clear that MAC added builder's risk coverage specifically for Otis and specifically for the APM construction project. Nothing in the UTIV policy is specific to the Minneapolis airport location or the APM project.

---

**13.** In light of the Court's holding that the damaged trams are not stock or material, it is unnecessary to decide whether the damage to them was "attributable to manufacturing or processing operations."

That policy covers the property of all UTC subsidiaries, including Otis, and a wide variety of risks worldwide. *See* FM L.R. 56(a)(1) Stmt. Ex. 19. Even though the UTIV policy insured Otis's property generally, and the tram was still Otis's property at the time of the accident, by its terms the MAC policy, having the specific and limited purpose of covering MAC property in Minnesota and that of its project contractors working on the Green Concourse APM project, functions closer to the risk at issue. Therefore Plaintiff Otis is entitled to judgment as a matter of law on FM's affirmative defense that the other-insurance clause precludes coverage under the MAC policy.

## IV. BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING

■ The second count of Otis's complaint alleges that FM breached the implied covenant of good faith and fair dealing by denying insurance coverage under the MAC policy. It is undisputed that Minnesota does not recognize this cause of action. *See Haagenson v. Nat'l Farmers Union Prop. & Cas. Co.*, 277 N.W.2d 648, 652 (Minn.1979) (holding in the context of a no-fault automobile insurance policy that "damages are not recoverable for bad-faith breach of contract. . . . A malicious or bad-faith motive in breaching a contract does not convert a contract action into a tort action.") (internal citation and quotation marks omitted). Connecticut does recognize a cause of action for bad faith failure to provide insurance benefits. *See Buck-*

*man v. People Express Inc.*, 205 Conn. 166, 530 A.2d 596, 599 (1987). For this reason, the choice of law is dispositive of defendant's motion for summary judgment on this count.

■ In a diversity action, a federal court must apply the choice of law rules of the forum state. *Klaxon Co. v. Stentor Elec. Mfg. Co.*, 313 U.S. 487, 496, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941). To decide the choice of law, the Court first must characterize this cause of action as either a tort or a contract claim. The Connecticut Supreme Court has characterized a breach of the covenant of good faith and fair dealing as a tort claim in the context of an action against a self-insured employer that violated a statute requiring that employees be given an opportunity for continuation of their health insurance after termination. *Buckman*, 530 A.2d at 599 ("this court recognizes an independent cause of action *in tort* arising from an insurer's common law duty of good faith.") (emphasis supplied); *see also United Technologies Corp. v. American Home Assurance Co.*, 118 F.Supp.2d 181, 186, 188 (D.Conn.2000), *United Technologies Corp. v. American Home Assurance Co.*, 989 F.Supp. 128, 135 (D.Conn.1997), *Nat'l Semiconductor Corp. v. Allendale Mut. Ins. Co.*, 549 F.Supp. 1195, 1200 (D.Conn.1982) ("Connecticut courts have ruled that a breach of the implied covenant provides an injured party with a *tort action*, notwithstanding that the acts complained of may also constitute a breach of contract.") (emphasis supplied) (collecting lower court cases).[14] Thus

---

14. *But see MM Global Services Inc. v. Dow Chemical Co.*, 283 F.Supp.2d 689, 702 (D.Conn.2003), suggesting that breach of the duty of good faith is a contract claim, but failing to distinguish between Connecticut and New York law. In New York, unlike Connecticut, "the covenant of good faith and fair dealing is not distinct from the underlying contract." *Geler v. National Westminster Bank USA*, 770 F.Supp. 210, 215 (S.D.N.Y. 1991). Further, while the cited case of *Union Trust Co. v. 714 Main Associates*, No. 312088, 1993 WL 7562, *15 (Conn.Super.Ct. Jan.6, 1993), states that Connecticut applies the duty of good faith dealing to "contractual relationships," 1993 WL 7562 at *16, it does not hold

Otis's bad faith claim should be analyzed under a tort model.

In tort cases, Connecticut generally applies the "most significant relationship" test of the Restatement (Second) of Conflict of Laws. *O'Connor v. O'Connor*, 201 Conn. 632, 519 A.2d 13, 21 (1986) ("...the time has come for the law in this state to abandon categorical allegiance to the doctrine of lex loci delicti in tort actions."). Section 145 of the Second Restatement controls the choice of law in tort actions:

(1) The rights and liabilities of the parties with respect to an issue in tort are determined by the local law of the state which, with respect to that issue, has the most significant relationship to the occurrence and the parties under the principles stated in § 6 [of the Second Restatement].[15]

(2) Contacts to be taken into account in applying the principles of § 6 to determine the law applicable to an issue include:

(a) the place where the injury occurred,

(b) the place where the conduct causing the injury occurred,

(c) the domicile, residence, nationality, place of incorporation and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

These contacts are to be evaluated according to their relative importance with respect to the particular issue.

Rest. (2d) Choice of Law § 145.

Weighing the factors in § 145, as discussed below, the Court concludes that the law of Minnesota should be applied. As to the first factor—the place where the injury occurred—Otis and FM agree that the injury occurred to Otis in Connecticut where the claim denial letter was received by Otis's in-house counsel, and where any resulting economic loss was suffered.

The second § 145 factor is the place where the conduct causing injury occurred. FM argues that it undertook activities such as investigation, review of contracts and witness statements, and communication with MAC and Otis, from its office in Minnesota. Otis counters that the final decision on the claim was made by Burton Wright out of FM's headquarters in Rhode Island. There is no contention that Rhode Island law should apply, however, so this factor weighs in favor of Minnesota.

The third consideration is the place of business of the parties, which does not weigh in favor of either state. FM is incorporated and has its principal place of business in Rhode Island; Otis's is in New Jersey; but neither New Jersey nor Rhode Island law is relevant to the choice of law analysis here. Both parties had Minnesota offices and FM argues that because Otis's Bloomington, Minnesota address is listed on the policy, the parties in

---

that an allegation of the breach of the duty of good faith is itself a contractual claim.

**15.** The general principles to take into account according to Restatement (Second) Conflict of Laws § 6(2) are:

(a) the needs of the interstate and international systems,

(b) the relevant policies of the forum,

(c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue,

(d) the protection of justified expectations,

(e) the basic policies underlying the particular field of law,

(f) certainty, predictability and uniformity of result, and

(g) ease in the determination and application of the law to be applied.

this case expected Minnesota law to apply. Otis responds that FM knew all along that Otis's headquarters were in Connecticut, and that it expected Connecticut law to apply to its operations.

Fourth, the Court must consider the place where the relationship between the parties is centered. FM argues that the parties' relationship is centered in Minnesota because: (1) the insurance policy was written for the MAC, a Minnesota governmental agency; (2) Otis's Minnesota address was listed on the contract; (3) FM's claim processing activities took place in Minnesota; and (4) Otis agreed that Minnesota law would govern its contract with the MAC. Otis argues that its relationship with FM is centered in Connecticut because it was the insured, its business was in Connecticut, and FM dealt only with Otis personnel located in the Connecticut office.[16] Application of this factor is somewhat uncertain because Otis and FM never had any direct relationship until this litigation, since the negotiations by which Otis was added to the MAC policy were carried out between FM and MAC. Under the totality of the circumstances, however, the relationship between Otis and FM is centered in Minnesota because the purpose of the policy was to insure a Minnesota governmental agency and its property and contractors working at the Minneapolis airport and associated Minnesota locations.

FM also argues that the guidelines of § 6 favor application of Minnesota law. FM's most persuasive argument is that to advance the cause of uniformity, all of the covered MAC's contractors should be governed by the same law. Indeed it would be anomalous to apply the laws of different states to an insurance policy written for

the benefit of the MAC, covering the MAC's contractors and subcontractors who were working at the Minneapolis airport, simply because the additional insureds happen to have their headquarters in other states. Plaintiff's assertion at oral argument that application of differing laws is inherent in a situation where out-of-jurisdiction entities are named as additional insureds on MAC's policy is unconvincing and circular, because if every court follows the above analysis, only Minnesota law will apply to MAC and all of its contractors.

Based on the totality of the factors in § 145 of the Second Restatement as well as the need for uniformity in application and interpretation of insurance contracts relating to a single location, the Court will apply Minnesota law to this case. FM's motion for summary judgment therefore must be granted on Otis's bad faith count because Minnesota does not recognize such a cause of action.

## V. CONCLUSION

Accordingly, Factory Mutual's motion for summary judgment [doc. # 56] is **GRANTED** as to Count Two and **DENIED** as to Count One. Otis's motion for partial summary judgment [doc. # 61] on its breach of contract count is **GRANTED**. Judgment shall enter accordingly and the Clerk is directed to close this case.

IT IS SO ORDERED.

---

**16.** FM contends that it corresponded with Otis personnel in Connecticut only because Otis so requested, but there is no evidence in the record that Otis's request was intended to manipulate the choice of law analysis in the event of litigation.