*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2012).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A13-2311**

Sean Kennedy,
Respondent,

vs.

Soo Line Railroad Company d/b/a Canadian Pacific,
Appellant.

**Filed February 2, 2015
Affirmed
Smith, Judge
Concurring in part, dissenting in part, Hooten, Judge**

Hennepin County District Court
File No. 27-CV-12-3265

Fredric A. Bremseth, Christopher J. Moreland, Bremseth Law Firm, P.C., Minnetonka, Minnesota (for respondent)

Kimberly L. Johnson, Arthur, Chapman, Kettering, Smetak & Pikala, P.A., Minneapolis, Minnesota; and

Timothy R. Thornton, Jonathan P. Schmidt, Briggs and Morgan, P.A., Minneapolis, Minnesota (for appellant)

Considered and decided by Ross, Presiding Judge; Hooten, Judge; and Smith, Judge.

UNPUBLISHED OPINION

**SMITH**, Judge

We affirm the district court's judgment holding appellant liable for respondent's injuries under the Federal Employers' Liability Act (FELA) because substantial evidence supports the jury's factual finding that appellant's employee violated a federal railroad-safety regulation, because the district court did not plainly err by erroneously instructing the jury, and because appellant waived its objection to the consideration of respondent's future conductor income in the damages calculation. We also affirm the district court's denial of respondent's motion for postverdict, prejudgment interest because postverdict, prejudgment interest is not available in a FELA action.

## FACTS

Shortly after midnight on September 5, 2011, respondent/cross-appellant Sean Kennedy was working for appellant/cross-respondent Soo Line Railroad Company as a conductor in a rail yard in La Crosse, Wisconsin. As conductor, he was responsible for using a radio to direct the engineer's train movements when dropping off and picking up train cars in the yard. The La Crosse yard contains 13 tracks of various sizes, running parallel to each other such that trains moving toward higher-numbered tracks must often move past lower-numbered tracks. Each track in the yard contains a clearance marker indicating the point beyond which the train cars must be placed to avoid being hit by trains moving toward other tracks.

The yardmaster directed Kennedy to drop off 45 cars onto track 8 in the yard, then pick up six cars from track 11, behind track 8. Although Kennedy recalled that the

yardmaster told him that the clearance marker on track 8 lined up with the marker on track 7, this was not the case at the end of the yard where Kennedy was to be working.

Kennedy positioned himself near the clearance marker on track 7 and directed the engineer by radio to push 45 cars onto track 8. He could not see the clearance marker for track 8. After all 45 cars were on track 8, the engineer stopped the train, leaving the last car short of the clearance marker on track 7. The engineer expressed concern that all 45 cars would not fit on track 8, and Kennedy assured him that there was sufficient room. Kennedy also indicated to the engineer that he was unable to see the clearance marker on track 8. The engineer was uncertain about what markers Kennedy was relying upon because he knew from prior experience that the clearance markers for tracks 7 and 8 did not line up at the end of the yard at which they were working. Kennedy directed him to move the cars approximately four feet past the clearance marker on track 7. Believing that Kennedy had resolved his uncertainty about the location of the track 8 clearance marker, the engineer complied. Kennedy then performed a procedure to set the brakes on cars being left on track 8, disconnected the cars from the train, directed the engineer to pull away, and set the track switch so that the train could move to track 11.

Kennedy boarded the last car remaining on the train and directed the engineer to move toward track 11. As the train moved, it struck the cars left on track 8. The train derailed and a car fell on top of Kennedy, seriously injuring him.

Kennedy sued Soo Line under FELA, alleging that Soo Line's negligence in the form of inadequate lighting and the engineer's violation of proper radio-communication procedure had caused his injuries. In cross-examination during a jury trial, Kennedy

3

agreed with Soo Line's counsel that he and the engineer "followed radio procedure," that "there was nothing improper about the radio communications that night," and that "the actions of [the engineer] did not contribute to this incident in any way."

At the conclusion of Kennedy's case-in-chief, Soo Line moved for judgment as a matter of law, alleging that Kennedy's testimony failed to establish that the engineer had violated any radio-communication regulation, and arguing that Kennedy had admitted that the engineer bore no fault for the accident. The district court reserved ruling on the motion.

During Soo Line's case-in-chief, the engineer testified that he was confused when Kennedy stated that the clearance markers on tracks 7 and 8 lined up, but that he no longer felt confused after Kennedy directed him to push one more car length. He explained that "at that point I felt that he found the clearance point and we needed to shove back one more car to get in the clear." He testified that he did not move the train until he received that second radio communication.

The district court denied Soo Line's motions for judgment as a matter of law and for a directed verdict. During deliberations, the jury sent a question to the district court asking whether Kennedy's actual award of damages would be reduced by the percentage of fault it assigned to him for the accident. With Soo Line's endorsement, the district court reiterated its original instruction, directing the jury to answer each question individually and not to consider the effect of each answer on other questions.

The jury found that both Soo Line's and Kennedy's negligence had contributed to Kennedy's injuries, and it allocated 60% of the responsibility to Kennedy and 40% to

4

Soo Line. It also found that, through the actions of the engineer, Soo Line had violated a federal radio-communication regulation, 49 C.F.R. § 220.45 (2013), and that this violation contributed to Kennedy's injuries. It awarded Kennedy compensatory damages totaling $3,646,277.

Soo Line renewed its motion for judgment as a matter of law, contending in relevant part that insufficient evidence existed in the record to support the jury's finding that Soo Line violated the radio-communication regulation. It also moved for a new trial, alleging that the radio-communication regulatory violation should not have been submitted to the jury or included in its jury instructions and that the district court had erroneously allowed the jury to calculate damages based on future conductor earnings. After the district court stayed entry of judgment pending resolution of posttrial motions, Kennedy moved the district court to modify the jury's damages award to include postverdict, prejudgment interest. The district court denied both motions.

## DECISION

### I.

Soo Line argues that Kennedy's radio-communication-regulation claim is unsupportable as a matter of law, mandating reversal of the district court's denial of its motion for judgment as a matter of law. We review a district court's denial of a motion for judgment as a matter of law de novo. *Langeslag v. KYMN Inc.*, 664 N.W.2d 860, 864 (Minn. 2003). But "[w]e must affirm the district court if, in considering the evidence in the record in the light most favorable to the prevailing party, there is any competent evidence reasonably tending to sustain the verdict." *Id.* (quotation omitted).

5

Soo Line first contends that Kennedy's statements that he and the engineer followed proper radio procedure, that there was "nothing improper" about their radio communications, and that the engineer "did not contribute to this incident in any way" constitute admissions that the engineer did not violate a federal radio-communication regulation. Under FELA, a railroad employer may be held liable for an employee's injuries without regard to the employee's contributory negligence if the actions of the railroad or its other employees violated a railroad-safety regulation. *See* 45 U.S.C. § 53 (2012) (stating that contributory negligence does not bar recovery if a railroad employee violated a safety statute); 49 U.S.C. § 21301 (2012) (mandating that violations of railroad-safety regulations are violations of the statute). A federal railroad-safety regulation prohibits train engineers from moving a train in response to a radio communication that they do not fully understand. *See* 49 C.F.R. § 220.45 (requiring that any radio communication not fully understood be treated as unsent).

Soo Line argues that Kennedy's testimony admits that the engineer's actions did not violate the radio-communication regulation. When "a party's testimony consists of a narrative of events in which he participated or which he observed, there is an obvious possibility that he may be mistaken like any other witness" and the issue "will not be concluded by his own statements." *Peterson v. Am. Family Mut. Ins. Co.*, 280 Minn. 482, 488, 160 N.W.2d 541, 545 (1968). "But, when a party testifies in regard to which he has special knowledge such as to his own motives, purposes or knowledge, or his reasons for acting as he did, . . . he will be bound by [his testimony], and contradictions by other witnesses become immaterial." *Id.* Soo Line asserts that Kennedy's testimony

6

disclaiming any possibility that the engineer violated the radio-communication regulation bars him from asserting such a violation to support his FELA claim. But the statements Soo Line points to do not speak solely to Kennedy's motives, purposes, knowledge, or reasons, they also speak to the engineer's. Kennedy cannot authoritatively testify about what the engineer knew or didn't know when he moved the train. Accordingly, we conclude that Kennedy's statements are not admissions that bind Kennedy or bar the jury's finding that Soo Line's engineer violated the radio-communication regulation.

Soo Line argues next that, even if we consider both Kennedy's and the engineer's testimony, there is no evidence establishing that the engineer violated the radio-communication regulation because both Kennedy and the engineer testified that the engineer did not move the train in response to a radio communication that the engineer did not fully understand. It highlights testimony from both Kennedy and the engineer that the engineer did not move the train when Kennedy indicated uncertainty about the location of the clearance marker on track 8 and that the engineer moved the train only after Kennedy made a second, unambiguous radio communication directing such movement. But viewing the evidence in the light most favorable to Kennedy, the engineer's testimony allows a different interpretation. The engineer testified that he did not move the train when Kennedy said that the clearance markers on tracks 7 and 8 lined up because he was confused about Kennedy's reasons for stating a fact that he knew was false. But the engineer did not question Kennedy or seek clarification. Instead, the engineer testified that when Kennedy sent a second communication directing the engineer to move the cars back the additional distance, he *assumed* that Kennedy had resolved his

confusion about the location of the clearance marker on track 8. Reliance on an assumption, without any effort to resolve the confusion, does not dispositively show that the engineer "fully understood" Kennedy's instructions. Accordingly, the record contains sufficient evidence that would support the finding that the engineer moved the train in response to radio communications that he did not fully understand.

Soo Line contends, however, that this interpretation of the record cannot support the jury's finding of a radio-communication-regulation violation because it requires analyzing two radio communications jointly instead of analyzing them individually. It asserts that the plain language of the radio-communication regulation requires that each radio communication be considered individually, without reference to any other radio communication. But the radio-communication regulation requires not only compliance with federal regulations, but also compliance with each railroad's internal safety rules. *See* 49 C.F.R. § 220.45 ("Any radio communication which is not fully understood or completed in accordance with the requirements of this part *and the operating rules of the railroad*, shall not be acted upon and shall be treated as though not sent." (emphasis added)). Although Soo Line's radio-communication rule parallels the federal radio-communication-regulation language, it also contains an exception requiring that "[a]n employee who receives information that may affect the safety of employees . . . must take the safe course" and instructing employees to "stop movement until the communication is understood." When confronted with Kennedy's ambiguous communication, this rule required the engineer to refuse to move the train until he understood the communication's meaning; it did not allow the engineer to simply assume that Kennedy had resolved his

8

uncertainty before sending the second communication directing him to move the train. The record allows the inference that, by not clarifying the meaning of Kennedy's first communication and relying instead on his assumption that Kennedy had, on his own, resolved his confusion about the location of the clearance marker on track 8, the engineer violated this rule and, in turn, violated the federal radio-communication regulation.[1] We therefore conclude that the district court did not err by denying Soo Line's motion for judgment as a matter of law.

## II.

Soo Line contends that the district court erred by submitting the radio-communication-regulation issue to the jury without specifically instructing it that it must also find that the regulatory violation caused Kennedy's injuries. It highlights comments accompanying the Seventh Circuit Court of Appeals' FELA Pattern Jury Instructions to argue that the district court failed to modify its instructions to make clear the requirement that the jury must find a causal link between a regulatory violation and a plaintiff's injuries to justify full recovery regardless of the plaintiff's contributory negligence under FELA. Because Soo Line did not request such a jury instruction,[2] we review only for

---

[1] Soo Line asserts that the railroad's operating rule was not properly before the jury because it was not specifically referenced on the special verdict form. But the rule was admitted as an exhibit for the jury's consideration, inclusion of a railroad's internal rules is plain from the text of the federal radio-communication regulation, and the jury heard expert testimony explaining the linkage between the federal radio-communication regulation and the railroad's internal rules. Soo Line's contention that the railroad's radio-communication was outside of the scope of evidence before the jury is therefore baseless.

[2] Soo Line cites its proposed special-verdict form to support its claim that the district court gave the radio-communication-regulation instruction over its objections. But the

plain error. *See* Minn. R. Civ. P. 51.04(b) (allowing application of plain-error analysis to jury instructions where no objection was made); *Frazier v. Burlington N. Santa Fe Corp.*, 811 N.W.2d 618, 626-27 (Minn. 2012) (applying plain-error analysis to a claimed jury-instruction error in a railroad-negligence case). Under plain-error review, we may redress an error when it is "necessary to ensure fairness and the integrity of the judicial proceedings," but only when an appellant demonstrates that there was error, that the error was plain, and that the error affected the appellant's substantial rights. *Frazier*, 811 N.W.2d at 626-27 (quotation omitted). "Failure to satisfy any of the prongs of the plain-error test dooms the claim." *Id.* at 626.

Soo Line fails to show any error in the district court's jury instructions. The special-verdict form required that the jury find that the regulatory violation "cause[d] or contribute[d]" to Kennedy's injuries. Although this language differs slightly from Soo Line's proposed form requiring that the jury find that the regulatory violation "directly cause[d]" Kennedy's injuries, Soo Line cites no authority that this minor difference constitutes error. Since "a relaxed standard of causation applies under FELA" and "[u]nder FELA the test of a jury case is simply whether the proofs justify with reason the conclusion that employer negligence played any part, *even the slightest*, in producing the injury," *CSX Transp., Inc. v. McBride*, 131 S. Ct. 2630, 2636 (2011) (emphasis added) (quotation omitted), there is no authority requiring Soo Line's proposed language.

---

record reveals that Soo Line's proposed special-verdict form did contain radio-communication-regulation questions. And Soo Line's proposed jury instructions contain no reference to the Seventh Circuit's FELA Pattern Jury Instructions or their comments.

10

Soo Line also contends that the jury instructions were confusing because they misinformed the jury about the effect of its contributory-negligence finding on damages. It cites Minnesota Rule of Civil Procedure 49.01(b) to support the claim that such an instruction is required under Minnesota law. It also highlights the jury's question to the district court, contending that the district court's failure to inform the jury that a finding of a regulatory violation would result in full recovery regardless of Kennedy's contributory negligence frustrated the jury's intentions regarding damages. Even if we assume the accuracy of Soo Line's belated reading of the jury's preferences,[3] the plain text of rule 49.01(b) specifically limits its scope to claims brought under chapter 604 of the Minnesota statutes; it is not relevant to a FELA claim. In non-chapter 604 cases, rule 49.01 prohibits the jury from considering broader effects of a special-verdict question. *See* Minn. R. Civ. P. 49.01(a) ("Except as provided in Rule 49.01(b), neither the [district] court nor counsel shall inform the jury of the effect of its answers on the outcome of the case."). We therefore conclude that Soo Line has not demonstrated error in the district court's jury instructions.

## III.

Soo Line contends that the district court erred by allowing the jury to consider expert testimony about Kennedy's future conductor earnings as part of its damages calculation. It asserts that Kennedy's employment was terminated because of his role in the incident that injured him and, as a result, was precluded from ever working as a

---

[3] The record reveals that Soo Line did not object to the district court's answer to the jury's damages-reduction question and, in fact, specifically requested it.

11

conductor again. Soo Line cites to its own district court motion to support these factual contentions, and it alleges that the district court considered evidence of Kennedy's wage-loss damages over its objections. But the district court noted that "[b]oth parties agreed at the [motions] hearing that no evidence regarding [Kennedy's] termination of his employment by [Soo Line], or the reasons therefor, would be introduced." And the portions of the trial transcript to which Soo Line cites contain no objections based upon the purported termination of Kennedy's employment. Soo Line's contentions regarding the termination of Kennedy's employment are therefore outside of the record, and it has waived any argument based on those contentions. *See Eisenschenk v. Eisenschenk*, 668 N.W.2d 235, 243 (Minn. App. 2003) ("[A] party cannot complain about a district court's failure to rule in [the party's] favor when one of the reasons it did not do so is because that party failed to provide the district court with the evidence that would allow the district court to fully address the question."), *review denied* (Minn. Nov. 25, 2003). We therefore decline to address the argument.

**IV.**

In a properly noticed related appeal, Kennedy argues that the district court erred by denying his motion to modify its judgment to award interest for the period between the jury's verdict and the district court's entry of judgment.[4] The availability of

_____

[4] This court recently rejected an identical argument in *Kinworthy v. Soo Line Railroad Co. See* 841 N.W.2d 363, 365-68 (Minn. App. 2013), *review granted* (Minn. Mar. 18, 2014). But because the supreme court has granted a petition for further review in *Kinworthy*, it is "of minimal precedential value to our analysis here." *See Fabio v. Bellomo*, 489 N.W.2d 241, 245 n.1 (Minn. App. 1992), *aff'd*, 504 N.W.2d 758 (Minn. 1993).

postverdict, prejudgment interest raises an issue of law that we review de novo. *Trapp v. Hancuh*, 587 N.W.2d 61, 63 (Minn. App. 1998).

Kennedy argues that Minnesota law requires that interest be awarded from the date of the verdict. *See* Minn. Stat. § 549.09, subd. 1(a) (2014) (requiring postverdict, prejudgment interest to be added). But the United States Supreme Court has held that, when addressing FELA claims, state courts must apply federal substantive law. *Monessen Sw. Ry. Co. v. Morgan*, 486 U.S. 330, 335-36, 108 S. Ct. 1837, 1842-43 (1988). It has further noted that "[i]t has long been settled that the proper measure of damages under the FELA is inseparably connected with the right of action, and therefore is an issue of substance that must be settled according to general principles of law as administered in the Federal courts." *Id.* at 335, 108 S. Ct. at 1842 (quotations omitted). Since any prejudgment interest is part of the proper measure of damages, *id.*, federal law, rather than state law, applies.

Kennedy cites other state-appellate-court opinions, however, to support his claim that *Monessen* should be understood as addressing only preverdict interest. He implies that *Monessen* is best understood as limited to cases where a verdict is immediately followed by entry of judgment, and he argues that postverdict interest is not a component of damages and is therefore a matter of procedural, rather than substantive, law. As such, he contends that state law applies. But he points to no language in *Monessen* indicating that postverdict, prejudgment interest is in any way different from other prejudgment interest. The dissent similarly attempts to distinguish this case from *Monessen* by replacing the word "prejudgment" with "preverdict." If the language or phrasing of the

13

United States Supreme Court in *Monessen* is to be found in need of modification, supplementation, or reinterpretation, it is beyond our role to do so. *See Lake George Park, L.L.C. v. IBM Mid-America Emps. Fed. Credit Union*, 576 N.W.2d 463, 466 (Minn. App. 1998) ("This court, as an error correcting court, is without authority to change the law."), *review denied* (Minn. June 17, 1998). Accordingly, Kennedy is not entitled to prejudgment interest.

**Affirmed.**

**HOOTEN**, Judge (concurring in part, dissenting in part)

I concur with the majority's treatment of the liability and damages issues considered in parts I, II, and III of this opinion. However, I must respectfully dissent from part IV of the opinion affirming the district court's refusal to apply postverdict interest to Kennedy's verdict under Minn. Stat. § 549.09 (2014). Soo Line's argument against applying postverdict interest relies primarily on *Monessen Sw. Ry. v. Morgan*, 486 U.S. 330, 108 S. Ct. 1837 (1988), where the Court held that FELA preempted a Pennsylvania rule awarding *preverdict delay damages*. I believe that *Monessen* is consistent with the application of *postverdict interest* in FELA actions in Minnesota state courts, especially when considered within the context of the Supreme Court's evolving preemption analysis as explained in *Felder v. Casey*, 487 U.S. 131, 108 S. Ct. 2302 (1988) and *Johnson v. Fankell*, 520 U.S. 911, 117 S. Ct. 1800 (1997).

I dissent for three reasons. First, there is a strong presumption that federal law does not preempt state law. When conducting a preemption analysis, courts are directed to start with the "basic assumption that Congress did not intend to displace state law." *Bldg. & Constr. Trades Council v. Assoc. Builders & Contractors of Mass./R.I., Inc.*, 507 U.S. 218, 224, 113 S. Ct 1190, 1194 (1993) (quotation omitted). A Minnesota court must be presented with "pervasive reasons" before determining a federal statute preempts state law. *Pikop v. Burlington N. R.R.*, 390 N.W.2d 743, 747 (Minn. 1986) (quotation omitted). The court must determine either that Congress has "unmistakably" ordained that the state law be preempted, or that "no other conclusion" besides preemption is permissible upon reviewing the issues presented. *See id.*

Beyond this normal presumption against preemption, a unanimous United States Supreme Court concluded that the presumption against preemption is "buttressed" when the state law at issue is neutral and involves the internal administration of state courts. *Johnson*, 520 U.S. at 918, 117 S. Ct. at 1805. This presumption is at its "apex" when state courts share responsibility for the enforcement of federal law and courts consider whether a federal law commands a state to alter the normal operations of its courts. *Id.* at 922, 117 S. Ct. at 1807. A separate unanimous United States Supreme Court also instructed courts hearing a preemption challenge to consider the "great latitude" state courts possess to determine the operation and structure of their own courts when applying state rules to federal claims. *Howlett v. Rose*, 496 U.S. 356, 372, 110 S. Ct. 2430, 2441 (1990). For all these reasons, litigants attempting to persuade a court that a federal statute preempts a state law governing the operation of its own court system bear a "heavy burden of persuasion." *Johnson*, 520 U.S. at 918, 117 S. Ct. at 1805.

My second reason for dissenting is that no binding authority governs the outcome of this case, and the reasoning behind the relevant caselaw persuades me that FELA does not preempt our statute. *Monessen* does not control the outcome of this case because we are analyzing a statute permitting the accrual of postverdict interest. By contrast, *Monessen* considered whether FELA preempted a state rule that added preverdict delay damages to a plaintiff's compensatory damages award in a FELA action. *Monessen*, 486 U.S. at 333, 108 S. Ct. at 1841. The additional damages were "'add[ed] to the amount of compensatory damages . . . for delay at ten (10) percent per annum, not compounded,' from 'the date the plaintiff filed the initial complaint in the action or from a date one year

after the accrual of the cause of action, whichever is later,' to the date of the verdict." *Id.* (quoting Penn. R. Civ. P. 238). The Supreme Court determined that FELA preempted *this particular damages rule* because it *added to the compensatory damages* a plaintiff could obtain. *Id.* at 335, 108 S. Ct. at 1842. The Court reasoned the preverdict delay damages were compensatory because they were "designed to make the plaintiff whole" and would constitute a "significant portion of a FELA plaintiff's total recovery." *Id.* at 342, 108 S. Ct. at 1846. Since the plaintiff's cause of action was a federal statute, and because compensatory damages "are inseparably connected with the right of action," the Court determined *this particular damages rule* impermissibly infringed upon Congress's authority to provide for damages in FELA actions and administer FELA. *See id.* at 335, 108 S. Ct. at 1842.

Unlike the rule in *Monessen*, Minn. Stat. § 549.09, subd. 1(a), does not "add to the amount of compensatory damages." *See id.* at 333, 108 S. Ct. at 1841 (quoting Penn. R. Civ. P. 238). The statute simply states that when a monetary verdict is reached, interest "from the time of the verdict" accrues on the award. Minn. Stat. § 549.09, subd. 1(a). The differences between our statute and the Pennsylvania rule are numerous and stark: the statute awards interest, not damages; the award accrues solely postverdict, rather than only preverdict; interest under the statute is not inseparably connected to a plaintiff's cause of action, it accrues on all verdicts; the statute is not dependent on the preverdict conduct of parties, it predictably and automatically awards interest on the verdict independent of any preverdict action; the statute does not interfere with Congress's

ability to determine the measure of liability in FELA actions, it merely provides defendants with a time-sensitive incentive to make good on their liability under FELA.

Applying Minn. Stat. § 549.09, subd. 1(a), to a monetary verdict in a FELA case simply alleviates a plaintiff's concern that the real value of his jury award might differ substantially depending upon whether he brings his case in federal versus state court. In federal court, the period between verdict and judgment is minimal, as the clerk must "promptly" enter judgment after the verdict. *See* Fed. R. Civ. P. 58(b). There is no analogous requirement that judgment be "promptly" entered in the Minnesota courts. The gap between verdict and judgment may be substantial. As illustrated by the facts of this case, the real value of Kennedy's multi-million dollar FELA verdict at judgment, when entered over six months *after* the verdict has been determined, is worth nearly $200,000 less than the date on which the jury rendered its decision.

The *Monessen* Court simply reiterated the repeatedly-acknowledged and long-standing principle that when adjudicating FELA claims, the underlying compensation scheme set out by Congress may not be altered. *See Monessen*, 486 U.S. at 335, 338, 108 S. Ct. at 1842, 1844 (collecting cases). But, once *damages* have been determined, the application of *interest* to that amount does not interfere with Congress's prerogative to set the measure of damages. *See id.* at 336, 108 S. Ct. at 1843 (citing the general federal interest statute, 28 U.S.C. § 1961 (1982)). All postverdict interest does is preserve the real value of the monetary verdict owed to a party. *See id.* at 339, 108 S. Ct. at 1844 (recognizing the "self-evident reason" that "money in hand is worth more than the like sum of money payable in the future") (quotation omitted).

This different treatment of preverdict interest and postverdict interest has been long recognized in Minnesota. Postverdict interest is "payment of a reasonable sum for the loss of the use of money to which plaintiff has been entitled since the time the verdict was rendered." *McCormack v. Hankscraft Co.*, 281 Minn. 571, 573, 161 N.W.2d 523, 524 (1968). By contrast, "pre-verdict interest is an aspect of compensatory damages." *Lienhard v. State*, 431 N.W.2d 861, 866 (Minn. 1988). And, our statute also accounts for *Monessen's* recognition of the distinction between rules which enhance preverdict compensatory damages and those rules which award postverdict interest. Minn. Stat. § 549.09, subd. 1(a), allows for the recovery of postverdict interest, while subdivision 1(b) allows for the recovery of preverdict interest when applicable. Were this case about enhancing preverdict damages awarded under subdivision 1(b), which would affect a plaintiff's underlying compensatory damages, the *Monessen* reasoning might dictate a different conclusion. But that is not the question before us.

The reasoning in *Monessen* is also consistent with the long-standing principle under Minnesota law that postverdict interest is not a penalty or a measure of damages. *See McCormack*, 281 Minn. at 573, 161 N.W.2d at 524. Instead, postverdict interest preserves the real monetary value of a verdict that might otherwise erode if a defendant is slow to pay. *See Lienhard*, 431 N.W.2d at 865. The *Monessen* Court explicitly acknowledged that preserving the time-value of money is an important consideration in FELA cases. *See* 486 U.S. at 339, 108 S. Ct. at 1844 (discussing purpose of discounting jury awards of future earnings in FELA actions to preserve "present value" of award).

Minn. Stat. § 549.09, subd. 1(a), also remedies the discrepancy between the real value of the monetary verdict awarded in FELA actions adjudicated in federal courts versus those litigated in state court. Federal courts recognize the time-value of money and loss in the real value of a monetary verdict for plaintiffs litigating state-court FELA claims. *See Louisville & Nashville R.R. v. Stewart*, 241 U.S. 261, 263, 36 S. Ct. 586, 588 (1916) (allowing state appeals court to add interest to jury's award). Minn. Stat. § 549.09, subd. 1(a) simply cures a plaintiff's qualms about bringing a FELA action in state court, as other state courts considering similar rules have reasoned. *See Lockley v. CSX Transp. Inc.*, 66 A.3d 322, 326–30 (Pa. Super. Ct. 2013); *Jacobs v. Dakota, Minn. & E. R.R.*, 806 N.W.2d 209, 216 (S.D. 2011); *Weber v. Chi. & Nw. Transp. Co.*, 530 N.W.2d 25, 30–32 (Wis. Ct. App. 1995). By accommodating federal claims and restoring parity between the real value of FELA verdicts awarded in state courts to match those FELA cases adjudicated in federal courts, we promote uniformity in the damages Congress sought to create with FELA. Minn. Stat. § 549.09, subd. 1(a), therefore also promotes federalism by ensuring that state courts "share responsibility for the application and enforcement of state law." *Johnson,* 520 U.S. at 922, 117 S. Ct. at 1807 (quotation omitted).

My final reason for dissenting is that the Supreme Court's preemption analysis has continued to evolve since *Monessen*, and Soo Line has failed to meet its heavy burden in arguing that our statute is preempted under the factors adopted by the Supreme Court in subsequent cases. After *Monessen*, the Supreme Court has repeatedly used a two-pronged test when examining the application of a state rule to a federal cause of action

litigated in state court to determine whether the state rule is preempted. The first prong asks whether the state rule "burdens the exercise of the federal right" found in the federal cause of action, and whether that burden conflicts with both the "design and effect" of the goals found in the federal statute. *Felder*, 487 U.S. at 141, 108 S. Ct. at 2308; *see also Johnson*, 520 U.S. at 918, 117 S. Ct. 1804–05. If the state law "interferes with or is contrary to federal law, [it] must yield." *Felder*, 487 U.S. at 138, 108 S. Ct. at 2307 (quotation omitted). The second prong turns on whether the application of the state rule is outcome-determinative, such that it would "frequently and predictably produce different outcomes" depending on whether the federal claim is brought in state or federal court. *Id.* at 138, 141, 108 S. Ct. at 2307, 2308; *see also Johnson*, 520 U.S. at 920–21, 117 S. Ct. 1805–06. For purposes of preemption analysis, outcome refers to the "ultimate disposition of the case." *Johnson*, 520 U.S. at 921, 117 S. Ct. at 1806.

Under this two-part test, our postverdict-interest statute cannot burden a federally-protected right as it is applied only *after* the rights and obligations of the parties have been adjudicated. By contrast, the rule preempted in *Monessen* altered the compensatory damages available to plaintiffs under a federal right of action; it was "contrary" to FELA and therefore had to "yield," *Felder*, 487 U.S. at 138, 108 S. Ct. at 2307 (quotation omitted), because it interfered with a rail carrier's federally-protected right in having its liability for compensatory damages determined by FELA, *see Johnson*, 520 U.S. at 922, 117 S. Ct. at 1806.

Minn. Stat. § 549.09, subd. 1(a), is also not outcome determinative. By the time the statute is applied, the underlying rights of the litigants have *already* been determined.

C/D-7

This was not true of the rule preempted in *Monessen.* That rule altered the disposition of cases by changing the value of the compensatory damages awarded. *See Monessen*, 486 U.S. at 335–36, 108 S. Ct. 1842–43. Further, the availability of a substantial award of preverdict delay damages when litigating a FELA claim in state court alters the incentives for defendants to settle, potentially changing the disposition of the case. *See Johnson*, 520 U.S. at 920, 117 S. Ct. at 1806 (clarifying "outcome determinative" standard by stating that adjudications which avoid a "judicial determination of the merits of the claim" result in a different disposition for preemption purposes).

Minn. Stat. § 549.09, subd. 1(a), does not affect a plaintiff's underlying compensatory damages; it merely preserves the real value of a final, already-determined compensatory damage award. The statute does not burden a plaintiff's rights under FELA and does not affect the disposition of the case. Rather, the application of our statute to FELA cases heard in Minnesota state courts protects the value of a plaintiff's underlying verdict and makes the litigation of FELA claims in state court more uniform with what occurs in federal court. And, most significant of all, applying Minn. Stat. § 549.09, subd. 1(a), to FELA cases tried in Minnesota satisfies the presumptions and principles that "are fundamental to a system of federalism[:]" when our state judiciary tries claims brought under federal law, we should enforce our own rules and statutes governing the operation of our court system. *Johnson*, 520 U.S. at 922, 117 S. Ct. at 1807 (quoting *Howlett*, 496 U.S. at 372, 110 S. Ct. at 2441).